**Harry H. WINER, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 12453.**

United States Court of Appeals
Sixth Circuit.

Jan. 13, 1956.

Robert N. Gorman, Cincinnati, Ohio, Harry Kasfir, Cincinnati, Ohio, on the brief, for appellant.

James M. Meek, Asst. U. S. Atty., John C. Crawford, Jr., Knoxville, Tenn., U. S. Atty., on the brief, for appellee.

Before SIMONS, Chief Judge; McALLISTER and MILLER, Circuit Judges.

## McALLISTER, Circuit Judge.

Appellant was convicted on an indictment for the offense of receiving, and having in his possession, goods, knowing that they had been stolen from railroad cars while they were moving as and were a part of an interstate commerce shipment of freight, in violation of Title 18 U.S.C.A. § 659. On the same trial, he was also convicted on another indictment in which he was jointly indicted with Marvin Siskin as a co-defendant, in which it was alleged that they had bought certain goods which had been stolen from a car while moving as an interstate shipment of freight and that they had received and had in their possession goods which were so stolen, in violation of the above mentioned section of the statute.

Appellant seeks review of the verdict and judgment, contending that the evidence on the trial disclosed that the interstate shipment of freight in question had terminated before the theft; that the trial court committed error in denying appellant's motion for a mistrial which was based on the ground that certain of the jurors sitting on the jury which convicted him had just previously sat on another jury that had convicted Marvin Siskin who had been jointly indicted, as above stated, with appellant Winer, but who had been tried separately as a result of a severance ordered by the court. Appellant also claims error in the refusal of the trial court to grant a new trial on the ground that one of the government witnesses had repudiated his testimony, as well as upon the additional ground of further error alleged to have been committed by the trial court during the hearing of appellant's motion for a new trial.

The government's proofs were to the effect that three young men had joined in stealing property from two railroad boxcars on a siding in Chattanooga, Tennessee. One of them broke the seals on the cars and the others assisted in removing the property. They were all arrested, pleaded guilty, and, at the time of the trial of the instant case at which they were witnesses, two were still serving sentences that had been imposed upon them, and the third had been released on parole. Their evidence, briefly, was to the effect that they had sold a considerable amount of the stolen property to appellant Winer. The leader among them testified that he had told Winer where the property had come from; that Winer had advised them to be careful and to hold on to the stuff for a few days until he could get a sale for it; that he afterward bought the property from them, as well as additional property stolen from the cars on several subsequent occasions; and that he paid them different amounts at the time of the different sales to him. He further testified that appellant Winer had asked them about the car from which they were stealing certain copper wire, and had inquired about the way in which the shipment was loaded in order to be sure that the stolen wire would not be missed. One of the witnesses testified that they had delivered to appellant a quantity of heavy bearings which they had stolen, by taking them to appellant's junk yard and throwing them over the fence. The evidence also disclosed that the three men had sold a quantity of the goods to Marvin Siskin, who, as said above, was jointly indicted with appellant; and it is conceded by appellant that he purchased such property—innocently, as he claims—from Siskin, and returned it to the railroad company when he discovered that Siskin had purchased it with guilty knowledge.

Appellant denied, without qualification, that he had purchased anything from any of the three men; and none of the property stolen by them was ever found on appellant's premises. The government's evidence, however, was sufficient to present to the jury the question whether the property was stolen from the railroad boxcars, and whether Winer had purchased it with guilty knowledge.

The chief issue in the case, therefore, is whether the property was stolen from railroad cars moving as, and a part of, interstate commerce, in violation of the statute.

Title 18 U.S.C.A. § 659, insofar as here applicable, provides:

"Whoever * * * steals, or unlawfully takes, carries away, * * * from any railroad car, * * * with intent to convert to his own use any goods or chattels moving as or which are a part of or which constitute an interstate * * * shipment of freight * * *; or

"Whoever buys or receives or has in his possession any such goods or chattels, knowing the same to have been * * * stolen;"

shall be guilty of the offense proscribed by the statute and liable to fine or imprisonment or both.

The property was stolen from two different railroad cars, one consigned by the Southern Railway Company, Memphis, Tennessee, to the Southern Railway Company, Chattanooga, Tennessee; and the other, consigned by the Southern Railway Company, Charlotte, North Carolina, to the Southern Railway Company, Chattanooga, Tennessee.

It is conceded by appellant that the fact that the carriage is by the owner does not serve to establish that interstate commerce is not involved, nor does it put the property outside the protection of the statute; Marifian v. United States, 8 Cir., 82 F.2d 628; and the circumstance that the shipper, the carrier, the consignee, and the owner of the goods, are one and the same person does not alter or prevent the application of the statute designed to protect commerce, which is here involved. Friedman v. United States, 1 Cir., 233 F. 429.

The car from Memphis, when it arrived at the Citico Yards in Chattanooga, was placed upon Track 22, on January 24, 1954. The theft from the car occurred before February 16, 1954, on Track 22, and while the shipment was under the seal placed thereon at the point of origin.

The car from Charlotte, when it arrived at the Citico Yards on February 4, 1954, was placed upon Track 22, just a few days before the theft, which occurred while it was on that track and while under the original seal.

The cars on Track 22 were not to be unloaded, and could not be unloaded, for the railroad's purposes, until they had been switched over to Track 1, where they could be unloaded directly into the company's warehouse. The railroad, on its records, does not show cars received until they are on Track 1 for unloading. Although the railroad records showed the cars as being in the yard, the division officer stated: "We never receive the materials until we check them out." In answer to a question on cross-examination as to whether the cars in question had reached their destination and as to whether "it was up to you to load or unload," the general foreman of the storage department of the railroad replied: "The material in the car had not reached final destination until placed in our storehouse." He further stated that the cars in question were not used as additional warehouse storage inasmuch as the shipments were not on the railroad accounts until they received them.

The interstate character of a shipment, insofar as it concerns the purchaser, receiver, or possessor of stolen goods, is to be determined as of the date of the theft. United States v. Gollin, 3 Cir., 166 F.2d 123. An interstate shipment does not lose its character as commerce until it arrives at destination and is there delivered. Murphy v. United States, 6 Cir., 133 F.2d 622. Even where the interstate shipment arrives at destination, is placed on delivery track, and notice given to the consignee who breaks the seal and unloads part of the shipment, if the carrier again reseals the car pending further unloading by the consignee, and the car is thereafter broken into and goods stolen, the shipment is still in interstate commerce as of the

time of the theft. Chapman v. United States, 8 Cir., 151 F.2d 740. Where delivery of imported liquor was made to a consignee at an ocean pier, and was afterward stolen while being taken from the pier to a bonded warehouse by a bonded truck, it was held that the shipment at the time of theft was still moving in interstate commerce. United States v. Schwartz, 2 Cir., 150 F.2d 627.

Appellant cites O'Kelley v. United States, 8 Cir., 116 F.2d 966, where a shipment, at destination, was delivered to and accepted by the consignee, who broke the seal and unloaded part of the shipment. He then locked the car with his own padlock and thereafter, it was broken into and the balance of the shipment stolen. It was held that the shipment at the time of the theft was not a part of interstate commerce; but this holding was based on the ground that the consignee had accepted and assumed full dominion over the property, which constituted a final and complete delivery; and that controlling consideration is not present in the case before us.

Appellant, however, contends that the shipments were received by the consignee, Southern Railway Company, Chattanooga, on the dates on which the railroad records showed the cars to have been "received," prior to the theft, and that the shipments, therefore, were no longer in interstate commerce after such receipt. The notation on the records that the cars had been received was explained, on cross-examination, by the division officer, who was also the district storekeeper for the railroad. He testified that such record showing the cars had been received on a given date indicated only that the cars had arrived at the yards in Chattanooga and had been placed on Track 22 at that time; and that not until the shipments were unloaded and checked in would the records show receipt of the shipments themselves. In view of the testimony and

evidence, the fact that the above mentioned records showed the cars to have been "received" is not conclusive that the shipments were no longer in interstate commerce after the date of their arrival in the Chattanooga Yards.

The trial court instructed the jury, in the course of his charge, that goods are in interstate commerce if the movement of the freight originates in one state and passes through another, even though it comes back to the state from which it started; that such a shipment remains an interstate shipment until it reaches the final termination of the journey, or destination; and that the final termination is the point where it is placed to be unloaded, or is being unloaded, in some cases. "And, as long as a car is still on a track and not placed at the unloading point, it is still in commerce." [1]

We find no error in the trial court's instructions, which are consonant with the authorities above discussed. Under the evidence, the jury could properly find that the cars containing the two shipments in question were in interstate commerce at the time the thefts were committed.

Appellant submits that the trial court prejudiced his case and erred in not granting his motion for a mistrial made at the conclusion of the government's proofs. Appellant's motion for a new trial was based on the ground that certain jurors who sat in a prior case in which Marvin Siskin had been convicted and with whom appellant had been jointly indicted, afterward were permitted to sit in appellant's case, although a severance had been granted. The court had ordered the severance on appellant's motion setting forth that he might be found guilty, by association with Siskin, who had theretofore signed a confession of guilt. Accordingly, appellant was thereafter tried alone.

It appeared, however, that nothing whatever had been said about appellant

---

1. The court also mentioned as an exception to the rule the situation where a consignee takes charge of the shipment in order to unload it at some point other than what would be its destination. But such exception is not applicable to the present case.

in the prior Siskin trial. The confession that Siskin made was not read in evidence, and, accordingly, no mention of appellant's name in it was disclosed to the jury on the prior trial. The proofs in the two cases were different. The violations of the statute in one case were separate and distinct from those in the other and were committed under different and disconnected circumstances; and the record does not disclose that any evidence was produced on the prior Siskin trial that bore upon appellant's case, or that the offenses charged against appellant were made the subject of proofs in the prior case. On the voir dire examination of the jury conducted by the trial court, it was mentioned by the judge, when a juror volunteered the statement that he had sat on the prior case, that nothing had been said about appellant in that case except that he might have bought some property. In answer to the court's interrogation, the juror in question had replied that such circumstance had left no impression about either the guilt or the innocence of appellant in the case in which he was being tried.

The evidence discloses that the trial court stated, after interrogating one of the jurors who sat on the prior case as to whether such service on the jury left any impression of appellant's guilt or innocence, that the juror in question was competent. Counsel for appellant, however, considered this statement of the court meant that the fact of service on the prior jury did not constitute grounds of challenge for cause. At the time the jury in appellant's case was sworn, including the three jurors who had sat on the prior Siskin case, counsel for appellant had exhausted all their peremptory challenges. The trial court observed on the hearing of a motion for a new trial that in his interrogation, he had ascertained that the jurors were competent; that they may have been subject to challenge for cause; although they were not challenged for cause, but, in fact, accepted.

Whether appellant properly challenged for cause or not, we think it proper to consider whether appellant was prejudiced in his right to a fair trial by the fact that three jurors who sat in the Siskin trial were jurors who subsequently convicted him. While the evidence was not the same against Siskin and appellant, both cases were concerned with the theft of property from the same boxcars. The witnesses who testified as to breaking the seals and stealing the property were presumably the same in both cases, although it does not appear from the record before us who the witnesses were in the Siskin case. Moreover, the witnesses who testified that they sold the stolen material to appellant were presumably the same as those who testified that they had sold other stolen material to Siskin. The jury, therefore, in the prior Siskin case, had probably passed upon the challenged credibility of the three main witnesses and had believed them in their testimony that they had sold the property to Siskin, and that he had guilty knowledge. Three of the members of this jury who had resolved the question of credibility in favor of the three witnesses in the Siskin case were called upon to resolve the credibility of the same three witnesses in appellant's case; and they resolved the question in favor of the witnesses as against appellant's testimony.

Yet there was no reason, merely because of the above circumstances, why a jury in appellant's case—including some members who had sat in the prior case—would have been more prone to believe the testimony of the three convicted felons than the testimony of appellant, a man bearing an unquestioned reputation for honesty, who had never before been in any trouble, and whose standing in the community as a good citizen was appreciated by the trial judge himself, as he stated during proceedings prior to sentence. And this consideration is emphasized by the fact that the jury in appellant's case was carefully instructed by the court on the necessity of the govern-

ment's proving appellant's guilt beyond a reasonable doubt; that the appellant was presumed to be innocent "and this presumption stands as a witness for him throughout the case"; and that, upon his proof of good character, "that character stands as a witness for him, throughout the case."

It is to be said that the verdict of the jury might be accounted for by the fact that, in addition to the testimony of the three witnesses above mentioned, there was a body of evidence which the jury could consider as bearing upon the question of appellant's guilt. It appeared that police officers, who came to see appellant and told him they were making an investigation about property stolen from railroad cars, stated that he became antagonistic; that he threatened "to wipe up the street" with one of the agents of the Federal Bureau of Investigation; that when they asked him for his records of material purchased, which were required to be kept by the ordinances of the City of Chattanooga and the laws of the State of Tennessee, he said he did not have any records; that he finally got a book and gave it to Officer Russell, but then jerked it out of Russell's hands and said that he would let his lawyer show him the book. Appellant was then arrested, taken to jail where he was held for about ten minutes, and then, after being represented by his lawyer, appeared in court in answer to a charge of not keeping his records as required by law, pleaded guilty and paid a fine of $50.00 and costs. In explanation of certain of the foregoing circumstances, appellant claimed that, as an honest businessman, he was incensed by the intimation of a charge that he was a receiver of stolen property, and that his conduct toward the officers was the result of his indignation over what he felt was an invasion of his rights as a citizen. All of these matters and claims were reviewed in a manner particularly fair to appellant by the trial court in the course of its instructions to the jury. The jury obviously considered this proof bearing upon appellant's attitude and conduct, as

corroboration of the testimony of witnesses who had stated that they had sold him the stolen property, and as evidence of appellant's guilt.

 The jury's verdict of guilt, therefore, could not have been vitiated by the circumstances that three members had sat on a previous case in which they had believed the testimony of the same felons whom they afterward also believed as witnesses in appellant's case. Appellant suffered no deprivation of a fair trial as a result of the service of some of the jurors in the prior case. Hindsight, possessed by everyone, suggests that it would have been the part of wisdom, however, not to have called any of the jurors who sat on the Siskin case to sit on appellant's case, inasmuch as serious and vital questions as to whether a defendant in a criminal case has had a fair trial often arise in this way.

It is contended by appellant that a new trial should have been granted on the ground that one of the witnesses repudiated his testimony after the verdict. The witness in question, Joe Denson, had testified on the trial that while employed by appellant, he had seen the three witnesses who had admitted the theft unloading rolls of copper wire from their truck onto the scales at appellant's junk yard; that he had also seen some boys throw metal goods over the fence at the yard. He further stated that, prior to the time he appeared before the grand jury, appellant told him that he did not want him to testify about anything that was thrown over the fence nor to talk any more about the case; and that he was in appellant's employ subsequent to his testimony before the grand jury. On cross-examination, he stated that he had been rejected for service in the army but that he did not know the reason for the rejection; that he did not "think" he could read; that he could barely write his name; that he did not know what month the boys with the metal had come to appellant's yard; that he could not add figures—did not know the sum of four and four; that he could not count; that he did not know what

day or date it was; and that he had talked that morning to one of the counsel for the government. On redirect examination, he stated that when he talked to the government counsel about testifying, counsel had stated that he wanted him to tell the truth no matter whether it hurt or helped the government or appellant; and that he had told the truth.

On the motion for a new trial, counsel for appellant informed the court that he had had a conference with the above mentioned witness, Joe Denson, after the trial of the case, and in the presence of his secretary; that he was aware that Denson's intelligence—"putting it mildly"—was such that it was a serious matter to have him make a statement on the witness stand under oath; that Denson had changed his statement about the facts of the case and that counsel would like to amend his motion for a new trial to include the claim of newly discovered evidence. The trial court then remarked: "They are charging this man perjured himself. He is getting in plenty of trouble." Counsel for appellant stated that he realized that fact; and government counsel then stated that they would send Denson to the penitentiary if he changed his statement. The court then remarked that the substance of that aspect of the motion was that Denson had changed his story, and appellant's counsel stated that such was the fact; that Denson had declared he had never seen the boys throw anything over the fence; and that, instead of appellant's telling him not to say anything to the officers or discuss the boys who stole the property, appellant had told him to tell the truth. Counsel also stated that Denson had said that he was scared when he made his prior statement; that the agents of the Federal Bureau of Investigation had him in their office and repeatedly questioned him; and by suggesting that he had seen the boys throw the goods over the fence, had finally secured from him a "yes" statement which he gave in order to avoid further questioning; but that he had not seen anything thrown over the fence and knew nothing about it. When Denson was then sworn as a witness on the hearing of the motion for a new trial, the court said:

"Joe, I think it is my duty to warn you. Of course what we want is the truth. You have sworn one way here in court. The lawyers say you will swear another way. If you are going to testify different from that one way, you will probably incriminate yourself, what is called perjury. You can testify or not testify under those conditions. I do not believe a man can be forced to testify where he incriminates himself.

"Do you want to testify, Joe?

"Witness: I don't want to, Judge.

\* \* \* \* \* \*

"The Court: Let the record show the witness not being of strong mentality, to be courteous to him, I think, under the protection of the Court because of his appearance, strength of mentality, and personality at that time particularly is entitled to the fifth amendment protection anyway."

Thereafter, counsel for appellant was permitted to set forth in an affidavit what Denson had told him and to file it in the case, the trial judge having previously remarked that he knew the lawyer was telling the truth but that he could not consider it without proof. In passing upon the motion for a new trial, the district judge stated that in his opinion, Denson's testimony "did not turn the balances on the jury, because the jury could see the kind of man he was and judge his testimony accordingly. Of course he is the type of man easy to go along with some one, somebody to get after him to back up. It is not at all unusual for the Court to have experienced witnesses testify on the stand and later want to back up when somebody has talked to them about it, not any particular pressure on them, but they do not like to offend anybody. We do not have that phase in the case, I do not think. And, of course he did not have to testify and incriminate himself, whatever he was going to say if anything different. But I do not believe his testimony was the

turning point in the case. In other words, I believe the jury would have convicted Mr. Winer whether he testified or not."

The trial judge, in his consideration of the question of Denson's change of his story and in his ruling denying the motion for a new trial based on that ground, in effect, considered the case in the same way as though Denson had actually testified before him on the hearing of the motion, and assumed that he had changed his story from the testimony which he had previously given.

From the cross-examination of Denson, it was clearly apparent to the jury that he was a man of small mentality. A witness who could not count, who did not know the day or date when asked him, and who was rejected for military service but did not know why, was the weakest kind of witness. Counsel for appellant felt that it was necessary to say that his intelligence was such that it was a serious matter for him to make a statement under oath at the time of the hearing of the motion for a new trial. The fact that the government used Denson as a witness; that he testified against appellant; and that after the trial, he made a statement contrary to his testimony before the jury, does not, under the circumstances of this case, compel a new trial on the ground that the witness willfully testified falsely to a material fact.

 The granting or refusing of a new trial upon newly discovered evidence of an impeaching character, including the recantation of a witness, rests in the sound discretion of the trial court; and a new trial will not be granted on the grounds of newly discovered evidence, unless such evidence is of a nature that, on a new trial, it would probably bring about a different result. It is for the trial judge to determine the probable effect it would have in changing the result on another trial; and in the absence of a clear showing of abuse of discretion, his action must stand. Morton Butler Timber Co. v. United States, 6 Cir., 91 F.2d 884; Larrison v. United States, 7 Cir., 24 F.2d 82; People v. Shilitano, 218 N.Y. 161, 112 N.E. 733, L.

R.A.1916F, 1044; Heald v. United States, 10 Cir., 175 F.2d 878. We find no abuse of discretion in the refusal of the district court to grant a new trial.

 If the trial court had permitted Denson to testify on the hearing of the motion in the manner and to the effect that counsel for appellant claimed that he would testify, and had then denied the motion for the same reasons as stated in the above quotation from his ruling, we would find no error. This being the case, we find no error in the action of the trial court in protecting Denson against self incrimination and, at the same time, in considering and ruling upon the motion for a new trial upon the assumption that Denson had changed his story as appellant's counsel said he had. By the same token, we find no prejudicial reversible error in the statement of government counsel, made on the hearing of the motion for a new trial, threatening Denson with the penitentiary if he committed perjury in changing his testimony for, as said above, the court's denial of the motion for a new trial was, in effect, made upon the assumption that Denson had changed his testimony.

In accordance with the foregoing, the judgment of the district court is affirmed.

MILLER, Circuit Judge (dissenting).

I am of the opinion that the goods in question were not stolen from railroad cars which were parts of interstate shipments of freight, in that at the time of the thefts the cars had arrived at their destination and had been delivered to and accepted by the consignee. O'Kelley v. United States, 8 Cir., 116 F.2d 966.

In this case the physical transportation as called for by the bills of lading had been completely performed. The consignee had notice of arrival and had the cars placed on its storage tracks. The delay in unloading the cars was for the convenience of the consignee. It is a well settled common law rule with respect to the liability of a carrier, that when goods have arrived at their destination and at the request of and for the convenience of the consignee remain in

the custody of the carrier, the status of the carrier is changed from that of a carrier to that of a warehouseman. General American Transp. Corp. v. Indiana Harbor Belt R. Co., 7 Cir., 191 F.2d 865, 873; Gus Datillo Fruit Co. v. Louisville & N. R. Co., 251 Ky. 566, 569, 65 S.W.2d 683; North Yakima Brewing & Malting Co. v. Northern Pacific R. W. Co., 49 Wash. 375, 95 P. 486, 16 L.R.A.,N.S., 935; Brown Shoe Co. v. Hardin, 77 W. Va. 611, 87 S.E. 1014, L.R.A.,N.S., 1916 D, 1199; Chicago, Milwaukee & St. P. R. W. Co. v. Kelm, 121 Minn. 343, 141 N.W. 295, 44 L.R.A.,N.S., 995; Brunson v. Atlantic Coast Line R. R. Co., 76 S.C. 9, 56 S.E. 538, 9 L.R.A.,N.S., 577. Delivery by the carrier is completed when the car is placed on consignee's storage tracks, although it may be necessary later to move it to a platform for unloading purposes. New York C. & H. R. R. Co. v. General Electric Co., 219 N.Y. 227, 114 N.E. 115, 1 A.L.R. 1417, with Annotation. In the present case, even if it be conceded that the cars were still in the custody of the carrier, they were in its custody as a warehouseman, not as a carrier. Theft of goods from a warehouseman is a state offense not covered by the statute. Hall v. United States, 8 Cir., 182 F.2d 833, 835.