**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Donald Lewis COLEMAN, Defendant-Appellant.**

**No. 73-1679.**

United States Court of Appeals,
Tenth Circuit.

Argued March 21, 1974.

Decided July 29, 1974.

Phil L. Hansen, Salt Lake City, Utah, for defendant-appellant.

Rodney G. Snow, Asst. U. S. Atty. (C. Nelson Day, U. S. Atty., Salt Lake City, Utah, on the brief), for plaintiff-appellee.

Before LEWIS, Chief Judge, and PICKETT and BARRETT, Circuit Judges.

LEWIS, Chief Judge.

Donald Lewis Coleman was tried under a two-count indictment which charged him with committing and attempting to commit aircraft piracy in violation of 49 U.S.C. § 1472(i), and with interfering with flight attendants in violation of 49 U.S.C. § 1472(j). He was convicted after jury trial in the United States District Court for the District of Utah and received concurrent 10-year sentences under each count. He has appealed, claiming that the trial court erred in denying his motions for judgment of acquittal and, alternatively, a new trial.

Coleman's defense at trial was insanity. Upon motion of the government, the court ordered that Coleman be examined by Dr. Eugene Bliss, a psychiatrist at the University of Utah Medical Center. His was the only expert testimony offered at trial, and it is on the basis of what Coleman claims is his unrebutted testimony that the alleged errors are claimed. It is Coleman's contention that there was insufficient evidence to sustain the government's burden of proving beyond a reasonable doubt that he was mentally competent at the time the crime was committed.

The test for determining criminal responsibility in this circuit was clearly stated in Wion v. United States, 10 Cir., 325 F.2d 420, 430, cert. denied, 377 U.S. 946, 84 S.Ct. 1354, 12 L.Ed.2d 309:

> The jury is then to be told that, as applied to their case, the test for criminal responsibility means that before they may return a verdict of guilty, they must be convinced beyond a reasonable doubt that at the time the accused committed the unlawful act, he was mentally capable of knowing what he was doing, was mentally capable of knowing that it was wrong, and was mentally capable of controlling his conduct.

In applying this test to our consideration of the issues raised by the instant case, we must bear in mind that the nature and quantum of the evidence which the government must produce to justify submission of the insanity issue to the jury necessarily varies with the nature and quantum of the evidence indicating mental incompetence. A thorough examination of the evidence adduced at trial is thus essential to our review.

On December 26, 1971 Coleman boarded American Airlines' nonstop flight 47 from Chicago to San Francisco. Stewardess Peggy Sue Harrell testified for the government that Coleman first asked her for a "rather strange drink" (creme de menthe and bourbon) and that she subsequently had several verbal exchanges with him. At one point Coleman remarked "I think I'll hijack a plane" and pulled out a gun[1] and said "all right now, I mean it." Stewardess Anne Marie Theiser then went to the rear of the plane and called the captain to inform him as to what had transpired. Coleman demanded a large sum of money and warned that the plane was not to go below 25,000 feet because he had plastic explosives in the cargo compartment. He repeatedly asked to talk to the captain and to go into the cockpit, claiming that he was a former pilot for United Air Lines. Stewardess Harrell further testified that Coleman also exhibited a knife during this period and inquired with reference to several passengers if they were Secret Service agents. The captain advised the crew that they would land in Salt Lake City. When the plane landed, Coleman made an unsuccessful attempt to jump out of the slide door. Stewardess Harrell later observed the apprehended Coleman in front of the airplane, crying and saying "They wouldn't believe me, they wouldn't believe me."

---

1. The gun was, in fact, a toy plastic revolver.

On cross-examination, Stewardess Harrell related that Coleman was confusing to her, that his actions were not those of an ordinary passenger, that he was irrational, that he jumped around in the things he talked about, and that rather than following a specific plan, his behavior was more a "muddled mess."

Stewardess Theiser's testimony corroborated that of Stewardess Harrell. She explained that the blade of Coleman's knife was open, but that he was "just holding it kind of." On cross-examination, she agreed with Harrell that Coleman was confused and didn't appear to be following any set plan of activity, although on redirect she testified that after Coleman inquired about Secret Service agents she felt that "he had something in mind."

The testimony of D. E. Ehman, a flying superintendent, was essentially in line with that of the two stewardesses. At one point, after Coleman had been displaying the gun and oddly "fanning" it, Ehman inquired of one of the stewardesses if Coleman was bothering them. She responded "No. The gun is a toy." Ehman believed that Coleman was joking and more a nuisance than anything else, but became concerned because he was making the passengers frightened and anxious. Ehman also stated, on cross-examination, that Coleman "wasn't acting rationally."

FBI Agent Charles Shepherd, one of the arresting officers at Salt Lake International Airport, testified that Coleman asked to call his attorney and that he overheard Coleman tell his attorney that he had hijacked an airplane. FBI Agent Harry Jones, another arresting officer, stated that Coleman told him that he had considered hijacking the airplane prior to boarding his flight.

The government rested and the defense called Dr. Bliss, who was accepted by stipulation as an expert in psychiatry. On the basis of two interviews conducted with Coleman after the airplane incident, Dr. Bliss stated that in his opinion Coleman was psychotic and not mentally competent on the date of the offense and that "in all probability" he was not mentally capable of knowing what he was doing. He stated that his behavior was under very poor control at the time, although he admitted that "It becomes a question, I suppose, of what kind of criteria you use. If he was surrounded by a dozen policemen, would he have done it? Probably not."

Dr. Bliss' opinions were based on the interviews themselves, Coleman's prior history, which revealed that he had a psychotic brother and that Coleman had experienced at least two previous psychotic episodes, and a disjointed letter allegedly written by Coleman while he was in jail following apprehension. Dr. Bliss admitted that the prior history had been developed through Coleman and his parents and that he did not personally know whether the information was accurate, but stated that his opinion would remain the same even without this information. He also stated that it would take an enormous amount of clever deception to fabricate this information because it had "internal consistency." He further stated that the behavior of Coleman on the date in question, as described to him by defense counsel, was entirely consistent with his diagnosis. He did admit, however, that if Coleman had planned the hijacking for several days "it would trouble me a bit."

In rebuttal, the government introduced several witnesses who testified as to Coleman's conduct prior to boarding the subject flight. An insurance saleswoman at O'Hare Airport in Chicago testified that Coleman approached her counter and said "I think I'm going to die. I better buy some insurance." He then pretended to be mute, but filled out the necessary forms and purchased three policies. He later told the saleswoman that he had acted mute because he was a salesman and was tired of talking.

Three American Airlines' employees testified that Coleman had acted as a

mute throughout his dealings with them. He originally purchased a one-way ticket for another flight, but he missed that one and had to take flight 47.

The manager of the apartment complex in which Coleman resided in Downer's Grove, Illinois also testified. He stated that he examined Coleman's apartment on December 31, 1971 and that he discovered, among other things, a parachute and newspaper headlines of hijackings pasted on the wall.

Finally, Dr. Bliss was again called to the stand by defense counsel. He stated that none of the testimony of the government rebuttal witnesses had caused him to change his opinion as to Coleman's mental competence on December 26, 1971.

█ In order to hold that the court below erred in denying the motion for judgment of acquittal we must be persuaded that, viewing the facts before us and the reasonable inferences to be drawn therefrom in the light most favorable to the government, reasonable men must necessarily possess a reasonable doubt as to defendant's sanity. United States v. Westerhausen, 7 Cir., 283 F.2d 844.

Both Coleman and the government rely on cases previously decided by this court. In McKenzie v. United States, 10 Cir., 266 F.2d 524, relied upon by Coleman, the court held that a judgment of acquittal should have been rendered because the government had failed to rebut the testimony of seven physicians and psychiatrists that the accused was not criminally responsible on the date of the offense. The prosecution offered no expert testimony in rebuttal, relying instead upon the testimony of nonexpert witnesses, to whom the defendant was a stranger, who stated that they observed nothing unusual or abnormal about the defendant immediately before and after the alleged crime. The court ruled that the "overwhelming" evidence of insanity had not been met by the meager evidence of the prosecution. The court stressed the fact that the lay witnesses

had had neither prolonged nor frequent opportunities to observe the subject. But it did point out that:

> As a general proposition, properly qualified lay witnesses may testify as to the sanity of an accused, and such testimony may be sufficient to satisfy the burden the law places upon the prosecution even though there is expert testimony to the contrary. *McKenzie,* supra, at 527.

In United States v. Stewart, 10 Cir., 443 F.2d 1129, relied upon by the government, the court ruled that the issue of insanity was properly presented to the jury. In that case, however, three experts testified as to defendant's sanity, with two concluding that the accused was criminally irresponsible but the third stating that he met the *Wion* test of criminal responsibility "within reasonable medical probabilities." In addition, the government introduced a police officer who testified that the accused appeared normal and "very professional" on the date of the alleged offense. A tape recording of a conversation between the accused and the officer was also admitted into evidence for the sole purpose of determining the accused's competency on the date in question. The court held that the *McKenzie* case was distinguishable on its facts in that the evidence of Stewart's insanity was by no means overwhelming, and concluded that the government evidence of sanity was sufficient to present a factual question for the jury's determination.

An examination of the factual predicates of *McKenzie* and *Stewart* readily discloses that they offer us little guidance in our deliberation here, for those cases provide textbook examples of when a motion for judgment of acquittal should and should not be granted. The evidence presented in the instant case affords no such clear-cut resolution.

█ It is undisputed that the presumption of sanity disappeared when Dr. Bliss offered his expert testimony and that the burden then shifted to the government to establish Coleman's men-

tal competency beyond a reasonable doubt. Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499. In its rebuttal of the testimony of Dr. Bliss, the government relies on the testimony of lay witnesses, but not in the ordinary sense. The rebuttal is based not on their opinion as to Coleman's mental competency, but rather on concrete facts and observations which, the government argues, offer indications of Coleman's competency. It thus points to Coleman's possession of newspaper clippings concerning hijackings, his purchase of flight insurance, his mute act at the airport, his inquiries about Secret Service and FBI men, his request to talk to his lawyer after his arrest, his statement to the FBI agent that he had considered the hijacking prior to boarding the aircraft, and his overheard statement to his lawyer that "I just hijacked an airplane" as solid evidence permitting the jury to find beyond a reasonable doubt that Coleman's behavior was that of a legally responsible person with a preconceived plan to hijack an airplane.

We conclude that the evidence was such as to justify submission to the jury of the determinative issue under the cited test of *Wion*, supra. The credibility and weight of expert testimony are matters within the jury's province and need not be accepted as conclusive even though uncontradicted by counter-medical expertise. Here the jury could well accept the fact that Coleman was abnormal and in need of psychiatric treatment, that his conduct was irrational in the sense of being "muddled," strange and disjointed. But, having accepted these premises, the jury could also determine that Coleman had pre-planned the piracy, knowing it to be wrong, and was capable of abandoning the plan if the presence of Secret Service or FBI agents had frightened him off or convinced him of failure. The evidence was sufficient as a matter of law to be submitted to the jury for its factual determination.

Affirmed.