**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Kenneth Eugene LUMAN, Defendant-Appellant.**

No. 79–1149.

United States Court of Appeals, Tenth Circuit.

Submitted March 12, 1980.

Decided May 28, 1980.

Rehearing Denied July 23, 1980.

Julian K. Fite, U. S. Atty., and John R. Osgood, Asst. U. S. Atty., Muskogee, Okl., for plaintiff-appellee.

James W. Fransein, Tulsa, Okl., for defendant-appellant.

Before HOLLOWAY, McWILLIAMS and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

Kenneth Eugene Luman appeals from a judgment entered following his jury conviction of possession of chattels of a value exceeding one hundred dollars, which chattels had been stolen while they were moving as, were a part of, and constituted an interstate shipment of freight, in violation of 18 U.S.C. § 659. The chattels were a truckload of automobile tires which had arrived in Tulsa, Oklahoma from Wisconsin on July 11, 1978 and were stolen at the consignee's Tulsa receiving yard during the night of July 12–13, 1978.

To establish the interstate character of the freight, the government called as witnesses a representative of the carrier and a representative of the consignee. Luman contends their testimony on this issue was not sufficient to present a question for the jury. In deciding this issue we must view the evidence presented in the light most favorable to the government and give the government the benefit of all legitimate inferences to be drawn therefrom. *See United States v. Freeman,* 514 F.2d 1184 (10th Cir. 1975); *United States v. Coleman,* 501 F.2d 342 (10th Cir. 1974); *United States v. Mallory,* 460 F.2d 243 (10th Cir. 1972), *cert. denied,* 409 U.S. 870, 93 S.Ct. 197, 34 L.Ed.2d 120 (1972); and *United States v. Twilligear,* 460 F.2d 79 (10th Cir. 1972).

The consignee's representative testified that on July 12, 1978, the carrier hauled a trailer to the consignee's warehouse and dropped it at the receiving dock. The driver left a delivery receipt with the consignee's employees but they would not sign it then. Following their usual practice, they did not intend to sign the delivery receipt until the trailer was completely unloaded and the quantities were verified. However, the employes broke the seal on the trailer that day and retrieved the packing slip inside. The packing slip purported to show the contents of the trailer. The employees would verify the packing slip against the actual contents only after the trailer was unloaded. Inasmuch as there was insufficient time remaining that day to unload the trailer, the employees decided they would wait until the next morning to start unloading. They padlocked the trailer and the consignee's warehouse manager retained the key.

The next morning the trailer was missing. Initially the employees believed the carrier had returned and hauled the trailer away. However, the carrier denied this. The trailer with its contents had in fact been stolen. It was not until the tires were recovered and returned to the consignee's warehouse on July 31, 1978 that the consignee's employees signed the delivery receipt. It was then discovered that the load was three tires short of the amount stated on the packing slip. That fact was noted on the delivery receipt.

On cross-examination, Luman's counsel asked the consignee's representative, "When that truck arrived [on the afternoon before the theft], you, for all practical purposes, after it had been spotted on one of your siding doors, your company had care, custody and control of that, is that correct?" The consignee's representative replied, "No, sir, we did not."

The carrier's representative testified that it was his responsibility as terminal manager to make certain that all freight was delivered on time. At the request of the consignee, the carrier left the truckload of tires at the consignee's warehouse on July 12, 1978 without obtaining a signed delivery receipt in exchange. On cross-examination, Luman's counsel asked, "But it was your understanding, then, that on the 12th [before the theft] this whole transaction had been concluded and consummated on the 12th?" The carrier's representative replied, "No, sir, it was not. We didn't have a signed delivery receipt." After examining the delivery receipt which the driver had left with the consignee on July 12, the carrier's representative testified that the receipt indicated the consignee accepted the contents of the trailer on July 31. The witness distinguished "tender" of delivery on July 12 from completed "delivery" on July 31.

▮ The government called several other witnesses who testified relative to other elements of the crime. Luman testified in his own defense. At the end of the government's case-in-chief and again at the close of all the evidence, Luman moved for a "directed verdict of acquittal". The District Court properly treated this as a motion for judgment of acquittal. Fed.Rules Cr. Proc. rule 29(a), 18 U.S.C.A. At the bench, the Court and counsel for both parties discussed whether there was sufficient evidence for the jury to find that the stolen tires constituted an interstate shipment at the time of the theft. Following this colloquy, which consumed some twenty-one pages of trial transcript, the Court aptly remarked, "Obviously if it was not in commerce at the time of theft, it's not a federal crime. This is so close that it might have been well to have sent this case down for state prosecution, then you wouldn't have had this problem."

Ultimately the Court denied the motion for judgment of acquittal. The Court instructed the jury that the interstate character of a shipment continued until the goods reached their destination and delivery was completed. The Court instructed that the jury could consider all of the evidence presented to it in deciding whether delivery of the tires had been completed at the time of the theft. Luman, through his counsel, reviewed all of the Court's instructions before closing arguments. Luman did not tender requested instructions and he did not object to the Court's instructions as submitted, though he maintained that the interstate commerce issue should be decided by the Court and not the jury.

On appeal, Luman contends: 1) The District Court erred in denying the motion for judgment of acquittal because, as a matter of law, the tires were not in interstate commerce and did not constitute an interstate shipment at the time they were stolen; and 2) there was insufficient evidence that Luman had custody, control, dominion or knowledge of the stolen tires.

I.

In considering Luman's motion for judgment of acquittal, the District Court repeatedly asked counsel what test the jury should use in deciding whether the tires had already left interstate commerce at the time they were stolen. The Court suggested such possible tests as "delivery," or the consignee's "acceptance," "dominion," "control," or "custody."

▮ In our view, no single event can be isolated as the point at which chattels lose their character as an interstate shipment and become an intrastate shipment or inventory. Most reported opinions discussing the question have held that a shipment does not lose its interstate character until it arrives at its destination and delivery to the consignee is completed. *See Winer v. Unit-*

*ed States,* 228 F.2d 944 (6th Cir. 1956), *cert. denied,* 351 U.S. 906, 76 S.Ct. 695, 100 L.Ed. 1442 (1956); *Chapman v. United States,* 151 F.2d 740 (8th Cir. 1945); *Murphy v. United States,* 133 F.2d 622 (6th Cir. 1943); and *O'Kelley v. United States,* 116 F.2d 966 (8th Cir. 1941). In *United States v. Cousins,* 427 F.2d 382, 385 (9th Cir. 1970), the court observed that, "The determination of whether a shipment is in interstate commerce at a given time is essentially a practical one, depending upon the relationship between the consignee, consignor, and carrier, the indicia of interstate commerce at the time the theft occurs, and the preservation of the congressional intent [to protect and promote goods in interstate commerce]." *Accord, United States v. Astolas,* 487 F.2d 275 (2d Cir. 1973), *cert. denied,* 416 U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305 (1974).

The cases of *United States v. Cousins, supra, Chapman v. United States, supra,* and *O'Kelley v. United States, supra,* all are factually similar to the instant case. In *O'Kelley,* the court held that when the consignee "accepted the car, broke the seal, removed part of its contents, and placed its private padlock on the door, the carrier no longer had possession but had surrendered dominion over the property to the consignee, and the consignee in turn had accepted and assumed full dominion and control over the property. This, we think, was a final and complete delivery. It was no longer a subject of interstate commerce." 116 F.2d at pp. 967–968. The *Chapman* case was like *O'Kelley,* except that after the consignee removed part of the contents, it was unable to get its padlock on the car and directed the carrier to reaffix the seal. The court, in upholding the conviction, distinguished *O'Kelley* "by the fact that the interstate shipment there involved had been delivered to the consignee, and dominion and control over it by the carrier had been completely surrendered. In the present case delivery had not been completed, and at the time of the occurrence of the acts charged in the indictment the car and its contents were in the possession and under the control of the carrier and protected by its seal." 151 F.2d at p. 741. In *Cousins,* the goods were stolen from a railroad car which was under seal by the carrier and sitting on a spur track patrolled by the carrier's agents. The consignee had not accepted the shipment. The court held that the goods were in interstate commerce at the time of the theft.

These opinions indicate that if the consignee does not have custody of the goods and has not accepted them, the goods are probably still in interstate commerce and constitute an interstate shipment. Inversely, if the consignee has custody of the goods and has also accepted them, the goods have probably lost the character of an interstate shipment.

In the instant case the consignee had custody of the tires, but had not accepted them before they were stolen. In our view, the fact that the consignee had custody of the tires does not alone compel the conclusion that the shipment had lost its interstate character. Goods loaded on trailers parked at the shipper's warehouse, awaiting arrival of the carrier's tractors which would haul them to another state, were held to be in interstate commerce in *United States v. Vilhotti,* 452 F.2d 1186 (2d Cir. 1971), *cert. denied sub nom. Maloney v. United States,* 405 U.S. 1041, 92 S.Ct. 1314, 31 L.Ed.2d 582 (1972), *cert. denied,* 406 U.S. 947, 92 S.Ct. 2051, 32 L.Ed.2d 335 (1972). One court has suggested that once goods are segregated on the shipper's loading platform with the intention of having them transported out of state, they constitute an interstate shipment. *United States v. Gollin,* 176 F.2d 889, 893–894 (3d Cir. 1949), *cert. denied sub nom. Richman v. United States,* 338 U.S. 848, 70 S.Ct. 89, 94 L.Ed. 519 (1949). By analogy, in the instant case the testimony of both the consignee's representative and the carrier's representative showed the following: The unbroken shipment of tires remained on the trailer, segregated from the consignee's inventory; the consignee's employees, in accordance with their custom, intended not to sign the delivery receipt until the trailer was unloaded and the actual contents were verified; and, despite the consignee's padlock on the trailer, the carrier and consignee did not regard delivery as

concluded, or the goods as being under the control or care of the consignee, until the consignee acknowledged receipt in writing, which was not done before the theft. This, in our view, amounted to sufficient evidence from which a jury could find, beyond a reasonable doubt, that the tires constituted an interstate shipment at the time of the theft. Therefore, we hold that the District Court did not err in denying Luman's motion for judgment of acquittal. *Cf. Burks v. United States*, 437 U.S. 1, 16, 98 S.Ct. 2141, 2149, 57 L.Ed.2d 1 (1978); *United States v. Lopez*, 576 F.2d 840, 843 (10th Cir. 1978).

## II.

Luman also contends that the evidence of Luman's custody, control, dominion and knowledge of the stolen tires was not sufficient to support the jury's verdict. Specifically, "the entire testimony of the appellant concerning his posture in this case . . . clearly show[s] that the evidence as introduced in its totality was insufficient as a matter of law and/or fact . . ." (Brief of appellant, pp. 23–24.)

An appellate court, in deciding an appeal from a criminal conviction, does not weigh conflicting evidence or assess the credibility of witnesses. *United States v. Waldron*, 568 F.2d 185 (10th Cir. 1977), *cert. denied*, 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 788 (1978); *United States v. Nolan*,

551 F.2d 266 (10th Cir. 1977), *cert. denied*, 434 U.S. 904, 98 S.Ct. 302, 54 L.Ed.2d 191 (1977). It was within the sole province of the jury to disbelieve Luman's testimony and to believe that of the government witnesses.

## WE AFFIRM.

HOLLOWAY, Circuit Judge, dissenting:

I respectfully dissent. My conclusion from the record, based on the undisputed facts and those recited in the majority opinion, is that when the theft occurred it was not from an interstate shipment within the meaning of 18 U.S.C. § 659. The Government should have left this prosecution to the State as the Congress intended.

To me, the salient facts are undisputed.[1] The shipment of tires was taken to the warehouse of Delta, the consignee, on July 12, 1978 (R. 13); the trailer was "spotted" at Delta's facility and the tractor was removed (R. 13, 29); Delta's warehouse manager broke the seal and removed the packing slip (R. 31, 39); and padlocks of Delta were placed on the door, the keys to which remained in the custody of Delta's warehouse manager. (R. 39). Moreover as the majority opinion notes, Delta's employees intended to unload the trailer and only delayed until the next morning because of the late hour of the trailer's arrival.[2]

Thus the effective possession and control of the tires were in Delta's hands.[3] In

---

1. The majority relies on the jury's resolution of the interstate commerce question as a factual issue. To me this is not persuasive because, even viewing the evidence in the light most favorable to the Government, there is not sufficient substantial proof from which the jury might find beyond a reasonable doubt that the theft occurred from an interstate shipment. *United States v. Twilligear*, 460 F.2d 79, 81–82 (10th Cir.). Moreover the evidence on this issue reviewed in this dissent was all adduced during testimony by Government witnesses.

2. Delta's representative testified that the trailer was not unloaded upon arrival at 2:30 p. m. (R. 28) because Delta's shipping people leave at five o'clock and there would not have been sufficient time to unload that day. (R. 29). He stated that "[they] were going to unload them the next morning." (R. 36). It is apparent that

the entire shipment of tires was to be unloaded into Delta's warehouse.

3. As noted by the majority, Delta's representative did reply negatively when questioned by Luman's counsel on cross-examination as to whether Delta had assumed care, custody and control of the trailer after it was spotted. The response was a conclusion which not only finds no substantial support in the record, but is in fact contradicted by the witness's own testimony that Delta broke the seal and placed its own padlocks on the trailer. (R. 39). The apparent basis for the witness's conclusion is that a delivery receipt had not yet been signed. Indeed, as the majority notes, the absence of a signed delivery receipt was the basis for the response of the carrier's representative that the carrier had not considered the transaction consummated upon tendering the trailer.

these circumstances I am compelled to conclude that the interstate shipment had arrived at its destination and that "the carrier no longer had possession but had surrendered dominion over the property to the consignee, and the consignee in turn had accepted and assumed full dominion and control over the property."[4]  *See O'Kelley v. United States*, 116 F.2d 966, 967–68 (8th Cir.).[5]  Whether the shipment would be retained and any shortage merely noted on the delivery receipt—as actually happened here[6]—or might be rejected was up to the consignee, but it *had* possession and control before the theft occurred nonetheless. Therefore, as in *O'Kelley* the conviction here cannot stand since the theft was not from an interstate shipment.

Nor can I agree with the Government's alternative ground suggested for affirmance.  The Government argues that the shipment was still moving as a part of interstate commerce since most of the tires were already on back-order and were destined for sale to retailers in other states, relying upon *United States v. Maddox*, 394 F.2d 297 (4th Cir.).  *Maddox* does not compel a different result here.  There sugar purchased in Puerto Rico was shipped to Baltimore and temporarily stored in a warehouse not owned by the consignee, pending final delivery to be arranged by customers in fulfillment of preexisting contracts.  The court rejected a defense contention based on the temporary storing of the cargo, but it recognized that

> The deposit of cargo in a warehouse may under certain circumstances constitute a coming to rest, marking the termination of an interstate or foreign shipment.  At other times, however, the stop-off at the warehouse may only be a pause in the course of an uncompleted journey. Standing alone, the removal of goods to a warehouse is not conclusive; nor is the consignee's power to divert the goods from the intended interstate commerce.

*Id.* at 299 (Emphasis added).  Of course, here the delivery of the goods did not stand alone but must be considered along with the breaking of the seal, the placing of Delta's padlock on the trailer, the removal of the tractor, and the fact that later shipment arrangements to the retailers had to be made.

The most that can be said for the Government's position is that Delta's representative testified that some 700 plus tires of the 1,145 tires in the shipment were already back-ordered for retailers in Oklahoma, Kansas and Arkansas and that the 700 plus tires would probably not have been in the warehouse over two days at the most.  (R. 34, 40).  Nevertheless it is clear that the *entire* load of tires was to be unloaded and put in Delta's warehouse. (R. 35–36).  Delta's representative admitted on cross-examination that its main business was that of purchasing and *storing* tires for resale.  (R. 37).  Hence I feel it is clear that the whole shipment had been delivered, marking the end of the interstate shipment from Wisconsin and that no later, separate shipments of the 700 plus tires to retailers had yet commenced when the theft occurred.

Accordingly I would reverse.

---

Delta's representative testified that the delivery receipt *"would be signed after [Delta] had completely unloaded the trailer and checked off the total quantities."* (R. 31).  (Emphasis added).

4. Indeed, on cross-examination, Luman's counsel asked Delta's representative, "on the 12th day of July, 1978 [the tires] were delivered, is that correct?"  Delta's representative replied, "This particular load was, yes, sir."  (R. 39).

5. The cases relied on by the majority are not to the contrary.  Rather, the facts of instant case are distinguishable from the facts in all those cases on two grounds: (1) the shipment had arrived at its destination when the theft occurred; and (2) the consignee's employees had broken the seal and placed Delta's padlock on the trailer.

I realize that in *O'Kelley* part of the contents of the sugar shipment had been removed by the consignee before the theft occurred.  The fact that here the actual unloading was delayed until the next morning does not control, in my judgment, in view of all the other acts by the consignee and the transportation company.

6. See Plaintiff's Ex. 1, II R. 18.