**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Anthony D. KENDRICK, et al.,
Defendants–Appellants.**

Nos. 86–2004, 86–2029, 86–2123, 86–2170.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 15, 1987.

Decided Aug. 5, 1988.

Bennett S. Engelman argued, Burton, Mich. (Court-appointed), Daniel D. Bremer, argued, Flint, Mich., Lawrence G. Kaluzny, Young & Kaluzny, Stuart L. Young, Birmingham, Mich., Howard J. Wittenberg, argued, Detroit, Mich., for defendants-appellants.

Robert Haviland, argued, Asst. U.S. Atty., Flint, Mich., for plaintiff-appellee.

Before MERRITT, KRUPANSKY and NELSON, Circuit Judges.

KRUPANSKY, Circuit Judge.

The facts are not materially in dispute. Defendants in these consolidated appeals sought reversal of their convictions following a jury verdict entered on August 4, 1986 finding them guilty of conspiracy and theft from an interstate shipment.

Fred Harper (Harper), the government's chief witness, had frequently stolen automobile parts from General Motors Corporation plants ("GM" or "GMC") during the 1960's and 1970's. Before 1981, Harper had contacted GM security officers and had proposed that in exchange for the payment of stipulated rewards, he would disclose information implicating certain GM employees who were stealing automobile parts. During 1982–83 Harper became acquainted with Wakefield Cook (Cook) who told him that he (Cook) "was able to move whatever you wanted" out of General Motors' Fisher Body plant in Flint, Michigan, where he was employed.

Harper thereafter introduced Cook to Jerry Quarles (Quarles), a tire dealer. In the fall of 1983, Cook introduced Harper and Quarles to Anthony Kendrick (Kendrick), another GM employee at the Fisher Body plant. Kendrick advised Harper and Quarles that he could move trailers of automotive parts from the Flint plant to a nearby "bull pen" where empty trailers were normally parked awaiting pick up by their owners. Harper volunteered to remove loaded trailers from the "bull pen" to wherever Quarles directed.

In March 1984, Cook alerted Harper that he (Cook) was prepared to remove a number of trailers loaded with automotive parts from the Fisher Body Plant. Harper immediately conveyed this information to GM security officers and offered assistance to prevent the theft in exchange for a $40,000 reward. On March 26, 1984, GM agreed upon the payment to Harper, and arranged a meeting between Harper and FBI agent Charles Whistler (Whistler). Only then did Harper disclose the time and location of the theft.

At 9:16 p.m. on March 29, trailer # 5227, owned by Kelso Trucking Co., transporting a load of windshields from Illinois, was delivered to a waiting area inside the Fisher Body Plant in Flint. Early the next morning Cook telephoned Harper and told him that the loaded trailer would be moved to the outside "bullpen" by defendant Kendrick. Mark Watzke (Watzke), joined Harper and Quarles and provided the tractor with which to move the trailer and parked it in the immediate vicinity of the "bullpen".

Watzke and Harper delivered Kelso Trailer # 5227 to a designated street in Hamtramck, Michigan, as directed by Quarles. Upon discovering that they had been under surveillance,[1] Watzke, Quarles and Harper abandoned the trailer. The trailer load of windshields was returned to the Fisher Body plant by GM security officers and GM Security Chief Marler (Marler) paid Harper the agreed reward.

Although their initial effort had been a failure, Quarles and Cook continued to discuss the scheme with Harper and decided upon another effort. Harper introduced FBI undercover agent Dan Reece (Reece) to Quarles; Reece offered to supply a tractor and on August 9 Reece met with Harper, Cook, and Kendrick "to solidify arrangements to go back to General Motors in Flint and steal a load of something."

The next day Harper introduced agent Reece to Martin Jermalowicz (Jermalowicz). They discussed the aborted attempt to steal the Kelso trailer load of windshields and Jermalowicz informed Reece that he (Jermalowicz) had been involved in the initial theft as the individual who was to assist Quarles in disposing of the parts if the March 30 scheme had succeeded.

On August 16 Harper, Reece, Jermalowicz, Cook, and Kendrick met to plan another theft. The conversation concerning the

---

1. FBI agents and GMC security officers had initiated a surveillance of the trailer from Flint after being alerted by Harper.

theft was recorded by Agent Reece. However, before the plan could reach fruition, the instant prosecution was initiated.

Quarles, Kendrick, and Cook were charged in the Michigan state court system with larceny of property with a value of over $100 and conspiracy to steal automobile parts. Subsequent to a preliminary hearing, a state district judge dismissed the charges on February 7, 1986 under M.C.L. § 766.13, ruling that there was no probable cause to bind defendants over for trial because they had been entrapped into committing the offenses by Harper. No jury was impaneled or sworn and no trial was conducted. Nor did the court consider the federal charges arising under 18 U.S.C. § 659.

On April 25, 1986, Quarles, Cook, Kendrick, Watzke, and Jermalowicz were indicted in the United States District Court for the Eastern District of Michigan and charged with conspiring to steal the automobile parts from interstate shipments, in violation of 18 U.S.C. §§ 371 and 659; all except Jermalowicz were also charged with the substantive count arising out of the March 30, 1984 theft of the windshields from an interstate shipment. Watzke pleaded guilty to the conspiracy charge and testified against the other defendants at trial, which resulted in jury verdicts on all counts against all defendants. Defendants joined in a post-trial motion for a judgment of acquittal arguing that the government had failed to prove the trailer of windshields was moving in interstate commerce at the time of the March 30, 1984 theft. The motion was denied by the District Court on September 22, 1986. All defendants were thereafter sentenced and filed timely appeals.

Defendants have assigned numerous assignments of error to the district court proceedings, charging that: 1) the stolen property was not moving in interstate commerce at the time of the theft and consequently, no federal jurisdiction attached to the offense and 2) under 18 U.S.C. § 659, a prior state dismissal of charges arising from the same incident constitutes a bar to federal prosecution.

■ Defendants-appellants initially urged that the substantive offense anchored in the March 30, 1984 theft was improvidently charged and did not constitute a violation of 18 U.S.C. § 659 because the trailer load of windshields was no longer in interstate commerce at the time it was stolen on March 30, 1984. Although defendants have conceded that the windshields were moving in interstate commerce on March 29, 1984 when Kelso transported the trailer from Illinois to Flint, Michigan, they argued that the shipment lost its interstate character when it was placed in the waiting area inside the Fisher Body plant at 9:16 p.m. on March 29. Standard operating procedures at the Flint installation mandated that after the Kelso or any other trailer had been unloaded, it would be removed to the "bull pen", also known as the "Kroger lot", an unguarded area outside the Fisher Body plant, where it would be spotted for pick-up by the owner trucking company. However, the Kelso trailer in issue was moved by the switcher (defendant Kendrick) to the "Kroger" lot on the morning of March 30 while still fully loaded with windshields and then stolen by Harper, Quarles, and Watzke.

At the time Kendrick transferred Kelso trailer # 5227 to the "Kroger lot" the trailer had not been accepted at the receiving dock, the freight bill and bill of lading had not been signed by Fisher Body, and the windshields had not been unloaded or inventoried.

It is elementary that interstate shipments such as those in the instant case do not lose their interstate character when they reach the purchaser's city. "[S]o long as its movement within the destination state can be considered a continuation of the movement that began out of state," an interstate shipment is involved. *McElroy v. United States,* 455 U.S. 642, 102 S.Ct. 1332, 1341, 71 L.Ed.2d 522 (1982). *Cf. United States v. Metzger* 778 F.2d 1195, 1207 (6th Cir.1985), ("government's burden as to interstate commerce element is to show that movement was a continuation of movement that began out of state") *cert.*

*denied,* 477 U.S. 906, 106 S.Ct. 3279, 91 L.Ed.2d 568 (1986).

In *United States. v. Petit,* 841 F.2d 1546 (11th Cir.1988), the court decided that goods remain in interstate commerce during the duration of a "sting operation" even if those goods have already arrived at the purchaser's place of business. In that case, as in the case at bar, the interstate shipment was used by the FBI in a sting operation *after* the shipment had already reached its destination, but the *Petit* court ruled that, for purposes of 18 U.S.C. § 659, the shipment retained its interstate character throughout the duration of the sting operation.

This case is even more explicit than *Petit* in that the windshields in the instant case were uninventoried and retained in a general holding area pending acceptance by GMC. Such goods remain in interstate commerce as the Second Circuit explained in *United States v. Astolas,* 487 F.2d 275, 282 (2d Cir.1973), *cert. denied,* 416 U.S. 955, 40 L.Ed.2d 305 (1974):

> [T]he goods were still sealed in the body of the trailer. They were segregated from all other middle Atlantic property. They had been neither examined nor accepted. A finding that the goods still constitute an interstate shipment was proper.

*See also United States v. Yoppolo,* 435 F.2d 625 (6th Cir.1970) (trailer at yard pending shipment was part of interstate shipment); *Winer v. United States,* 228 F.2d 944, 948 (6th Cir.) (as long as car is still on track and not placed at unloading point, it is still in interstate commerce) *cert. denied,* 351 U.S. 906, 76 S.Ct. 695, 100 L.Ed. 1442 (1956); *United States v. Luman,* 622 F.2d 490, 493 (10th Cir.1980) (where "unbroken shipment of tires remained on the trailer, segregated from the consignee's inventory," and trailer re-

mained at receiving dock, shipment was still in interstate commerce).[2]

■■■ Defendants next argued that they had been acquitted on the merits of the charges lodged against them in federal court in a prior state court preliminary examination based upon the same acts, as charged in 18 U.S.C. § 659, the pertinent provision of which reads as follows:

> A judgment of conviction or an acquittal on the merits under the laws of any State shall be a bar to any prosecution under this section for the same act or acts.

This court concludes that the above-cited provision is inapposite because the instant state court dismissal which resulted from a preliminary examination was not "on the merits."

The above-referenced statutory prohibition against federal prosecution for the same acts which have been subject to a state prosecution creates a double jeopardy bar to protect defendants notwithstanding the holdings of *Bartkus v. Illinois,* 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959) and *Abbate v. United States,* 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959) (double jeopardy clause does not apply to prosecutions by separate sovereigns such as state and federal governments).

However, there is no indication that the statutory bar in § 659 was intended to be broader than the constitutional double jeopardy bar which applies in cases involving only one sovereign. Indeed, the legislative history of 18 U.S.C. § 659 reflects that its primary purpose was to provide "effective remedies for developed evils with which the state authorities seem wholly incompetent to deal." 49 *Cong. Record*—Senate (1913) at 2481. Accordingly, only if a state judgment was "on the merits" would it bar subsequent federal prosecution.

The state court dismissal was not "on the merits." "The preliminary examination of

---

2. Appellants' contention that the district court committed reversible error by failing to include appellants' proposed jury instructions is misplaced. This court must review the instructions in their entirety. *E.g. Teal v. DuPont de Nemours & Co.,* 728 F.2d 799, 802 (6th Cir.1984). After an examination of the entirety of the low-

er court's jury instruction, this court concludes that there is no basis in law for appellants' request. *See United States v. McGuire,* 744 F.2d 1197, 1201 (6th Cir.1984), *cert. denied,* 471 U.S. 1004, 105 S.Ct. 1866, 85 L.Ed.2d 159 (1985) (criminal defendant has no right to select particular wording of jury instruction).

**496**

one arrested on a suspicion of a crime is not a trial, and his discharge by the magistrate upon such examination is not an acquittal." *Collins v. Loisel,* 262 U.S. 426, 429, 43 S.Ct. 618, 619, 67 L.Ed. 1062 (1923). "The constitutional provision against double jeopardy can have no application unless a prisoner has, therefore, been placed on trial." *Id.* "Jeopardy does not attach in a criminal case until a defendant is put to trial before the trier of fact, which in a jury trial occurs when a jury is impaneled and sworn and in a non-jury trial when the court formally commences the trial by accepting evidence." *United States v. Talbot,* 825 F.2d 991, 997 (6th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 773, 98 L.Ed.2d 860 (1988).

At the state level, no trial was commenced, no jury was sworn and there was no conclusive adjudication of the ultimate issues in the criminal case. The state magistrate only adjudicated the propriety of the criminal complaint and warrant and the seizure of the defendants' persons and found no probable cause to hold the defendants. Hence, discharge of the defendants at the conclusion of the preliminary examination did not bar further prosecution for the charged violation of 18 U.S.C. § 659; the preliminary examination did not place defendants in jeopardy. *People v. Riley,* 72 Mich.App. 299, 249 N.W.2d 397 (1976). *Accord, People v. Miklovich,* 375 Mich. 536, 134 N.W.2d 720 (1965) (discharge, upon examination, of accused is not bar to his subsequent arrest, examination and trial for the same offense because he has not been placed in jeopardy). *See also People v. George,* 114 Mich.App. 204, 318 N.W.2d 666 (1982) (presentation of second identical charge to a new judicial officer after dismissal of the original charge before trial was not a violation of the double jeopardy clause).

Defendants argued that since the state judge's decision was based on the entrapment defense, it was the functional equivalent of "on the merits" under § 659. It is well-settled in federal and state courts that a decision at the preliminary examination stage does not bar subsequent indictment and prosecution. *See Serfass v. United States,* 420 U.S. 377, 391–92, 95 S.Ct. 1055, 1064, 43 L.Ed.2d 265 (1975); *Collins v. Loissel,* 262 U.S. at 429, 43 S.Ct. at 619; *People v. Riley,* 249 N.W.2d at 389–99. This same principle applies to cases involving § 659. *See United States v. Malfetti,* 213 F.2d 728, 729–30 (3d Cir.1954); *United States v. Scarlata,* 214 F.2d 807, 809 (3d Cir.1954).

■ In short, the Michigan decision was not "on the merits" as 18 U.S.C. § 659 requires. Because this court has examined all of defendants' assignments of error and has found that they are all without merit, the jury conviction in the lower court is thereby AFFIRMED.[3]

---

**3.** Defendants' evidentiary assignments of error are groundless. Defendants argued that the district court committed reversible error when it declined to admit the hearsay testimony of Case Agent Whistler. However, the proponent of a hearsay statement bears the burden of proving that the statement fits squarely within a hearsay exception or exclusion. *United States v. Day,* 789 F.2d 1217, 1221 (6th Cir.1986). Defendants have not answered the government's hearsay objection, and it is doubtful whether they could do so. There is authority in other circuits that a statement by a government employee is not usable against the sovereign in a criminal prosecution on an admissions theory (see, *e.g., United States v. Kampiles,* 609 F.2d 1233, 1246 (7th Cir.1979)), and even if we were to conclude that this authority is inconsistent with the language of Rule 801 of the Federal Rules of Evidence, it seems clear that the district court had discretion to exclude the proposed testimony, under Rule 403, because its probative value was substantially outweighed by the danger of unfair prejudice and confusion.

Defendant Cook contended that the introduction of a written redacted confession of defendant Kendrick prejudiced him (Cook). But the confession was edited so that it did not mention Cook. Such a confession was not so incriminatory so as to violate the Confrontation Clause. *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 1707–1708, 95 L.Ed.2d 176 (1987).