**UNITED STATES of America,**
**Appellee,**

v.

**Roland William DUBE, Jr.,**
**Defendant-Appellant.**

**No. 75–1034.**

United States Court of Appeals,
First Circuit.

Argued May 5, 1975.

Decided June 30, 1975.

Peter L. Murray, Portland, Maine, by appointment of the Court, Murray, Plumb & Murray, Portland, Maine, was on brief, for appellant.

Peter Mills, U. S. Atty., for appellee.

Before COFFIN, *Chief Judge,* McENTEE and CAMPBELL, *Circuit Judges.*

McENTEE, *Circuit Judge.*

Defendant Dube was tried on an indictment charging him with robbery of a federally insured bank. He did not deny that he committed the robbery, but introduced the testimony of a psychiatrist and a psychologist that he was insane when he committed the offense. The prosecution did not present expert opinion evidence but relied instead on cross-examination and the lay testimony of two bank tellers and Dube's accomplice to rebut his case. Dube moved for a judgment of acquittal on the ground that the prosecution had failed as a matter of law to sustain its burden of proving his sanity beyond a reasonable doubt, but the motion was denied. The jury returned a verdict of guilty and Dube appeals.

█ A criminal defendant is presumed sane, but the introduction of evidence of insanity dispels the presumption and subjects the prosecution to the burden of proving sanity beyond a reasonable doubt. *Beltran v. United States,* 302 F.2d 48, 52 (1st Cir. 1962). Insanity is a jury question unless a reasonable man viewing the facts and reasonable inferences therefrom in the light most favorable to the prosecution must necessarily possess a reasonable doubt as to the defendant's sanity. *United States v. Coleman,* 501 F.2d 342 (10th Cir. 1974). The nature and quantum of rebuttal evidence sufficient to present a jury question is to some extent determined by the strength of the case for insanity. *United States v. Bass,* 490 F.2d 846, 851 (5th Cir. 1974). There is no general principle that the prosecution must counter defendant's expert medical evidence with expert testimony of its own. *See United States v. Shackelford,* 494 F.2d 67 (9th Cir.), *cert. denied,* 417 U.S. 934, 94 S.Ct. 2647, 41

L.Ed.2d 237 (1974). The expert testimony is not conclusive even where uncontradicted; its weight and credibility are for the jury to determine, *United States v. Lutz,* 420 F.2d 414, 415 (3d Cir.), *cert. denied,* 398 U.S. 911, 90 S.Ct. 1709, 26 L.Ed.2d 73 (1970), and it may be rebutted in various ways apart from the introduction of countervailing expert opinion.[1]

■ We do not think the evidence in this case was such that a reasonable man must necessarily have entertained doubts as to defendant's sanity. Both Dr. Voss, the psychiatrist, and Dr. Bishop, the psychologist, testified that in their opinion defendant was a schizophrenic and substantially incapable of conforming his conduct to the requirements of the law at the time of the crime.[2] They arrived at those diagnoses nearly five months after the robbery and only a week before trial. Dr. Voss's opinion was based on two hours of interviews and Dr. Bishop's on a one-hour interview and three hours of intelligence and personality testing. Diagnoses based on such minimal observation are suspect. *Mims v. United States,* 375 F.2d 135, 146 (5th Cir.

1967). Though both examined and diagnosed defendant separately, they subsequently discussed his case together before testifying. Neither had any prior acquaintance with defendant nor did either treat him at any time. In fact, in contrast to most of the cases defendant cites, he had no organic manifestations, had never received any psychiatric treatment and had experienced no earlier abnormal episodes of any kind. *Id.* Some of the factors the experts relied on in reaching their diagnoses were contradictory or unconvincing.[3]

■ Most importantly, Dr. Voss's diagnosis was based almost entirely on the subjective history narrated by defendant and his counsel, *see United States v. Ingman,* 426 F.2d 973 (9th Cir. 1970), and Dr. Bishop undoubtedly interpreted the test results in light of the history he received. Both testified that they were able to detect malingering and that defendant could not fabricate a history suggesting schizophrenia, but of course a jury would not be bound to believe these assertions. *Id.* Indeed the factual assumptions they derived from Dube's nar-

---

1. In *Mims v. United States,* 375 F.2d 135, 143–44 (5th Cir. 1967), the court stated that expert testimony may be rebutted

   "by showing the incorrectness or inadequacy of the factual assumptions upon which the opinion is based, 'the reasoning by which he progresses from his material to his conclusion,' the interest or bias of the expert, inconsistencies or contradiction in his testimony as to material matters, material variations between the experts themselves, and defendant's lack of co-operation with the expert. Also in cases involving opinions of medical experts, the probative force of that character of testimony is lessened where it is predicated on subjective symptoms, or where it is based on narrative statements to the expert as to past events not in evidence at the trial. In some cases, the cross-examination of the expert may be such as to justify the trier of facts in not being convinced by him. One or more of these factors may, depending on the particular facts of each case, make a jury issue as to the credibility and weight to be given to the expert testimony . . . ." (footnotes omitted).

   *See also United States v. McGraw,* 515 F.2d 758 (9th Cir. 1975), holding that defendant's expert testimony may be rebutted by cross-ex-

amination or evidence from which the jury could infer that the defendant's expert testimony depended upon an incorrect view of the facts.

2. Dr. Voss qualified his opinion by noting that he of course was not present on the day of the robbery and that his diagnosis was predicated in large part on the defendant's own description of his thought processes that day, the accuracy and completeness of which are open to grave doubt in the light of the accomplice's testimony. Dube "remembered very little" of the incident, according to Dr. Voss.

3. Thus Dr. Bishop opined that Dube's emotional response was "flat," a judgment based in part on his "wet fish handshake," while Dr. Voss characterized Dube as open and friendly. Dr. Bishop also stated that Dube had a "basic thought disturbance" illustrated by his response "Holler fire" to the question "If you were the first one in a movie to discover smoke or see a fire, what would you do?" Dr. Bishop considered this response inappropriate since it deviated from the response given by a majority of 3,000 of the control group, but admitted that Dube's educational background would affect his response. *See United States v. Shackelford, supra.*

rative, on which they predicated their conclusions, did not comport with the testimony at trial. On the basis of defendant's statements, both regarded the robbery as compulsive and irrational, but the testimony of Mrs. Kyllonen, the accomplice, furnished abundant evidence of a carefully planned and executed crime.[4] The experts' testimony also seemed to rest in part on the notion that bank robbery is an irrational activity in the first place, making the competence of a bank robber at least suspect.[5] Both concluded that defendant was shy, a "loner," unable to form emotional attachments to others, but Mrs. Kyllonen testified that she was in love with defendant, that they had lived together for as long as three weeks before the robbery and that they had arranged to get back together after defendant disposed of some stolen checks in New York. She also testified that during the period immediately after the robbery she did not notice anything peculiar about defendant's activities. Since expert opinion rises no higher than the reasons on which it is based, *Dusky v. United States*, 295 F.2d 743 (8th Cir. 1961), *cert. denied*, 368 U.S. 998, 82 S.Ct. 625, 7 L.Ed.2d 536 (1962), we cannot say that it would be unreasonable to discount the testimony of Drs. Voss and Bishop heavily. We agree with our concurring brother that the prosecution was remiss in not offering psychiatric testimony of its own. However, on all the evidence we think the court correctly allowed the case to go to the jury. *See United States v. Coleman, supra.*

*Affirmed.*

LEVIN H. CAMPBELL, *Circuit Judge* (concurring).

I find this a difficult case to analyze though, on the facts, I concur in the result. The court dwells on the inadequacy of the psychiatrist's and psychologist's diagnoses. While in certain respects I think it is overly critical, I agree that the jury was entitled to be skeptical of opinions of insanity based upon relatively brief examinations made several months after the crime and at a time when Dube had everything to gain from a finding of insanity. There were, besides, indications from which a jury might wonder if the experts were confusing insanity in the criminal sense with a less fundamental disorder.

Still it is not simple to identify the affirmative evidence from which the jury could find defendant sane *beyond a reasonable doubt*. Certain conclusions, could, it is true, be drawn from Dube's girl friend's description of his conduct

---

4. According to Dr. Bishop, Dube stated he had no intention of robbing a bank when he left home that day, and that he and Mrs. Kyllonen passed a bank while driving along and that he did not know whose idea it was to enter the bank and rob it. Based upon this statement Dr. Bishop concluded that Dube's behavior was "inappropriate." Mrs. Kyllonen, however, testified that Dube first discussed robbing the bank after arising that day. He cased and rejected several banks on the ground that they were too well protected, or otherwise unsuitable, and finally chose one which was unprotected, staffed by only two women, empty of customers and about to close, with a parking space for the getaway car nearby. After robbing the bank defendant changed clothing, hid his old clothes, and had Mrs. Kyllonen drive to a hospital parking lot ("he knew just where he wanted to go," she testified) where they waited for a few hours listening to the radio for a report of the crime. They then counted the money and drove down the coast to avoid capture, and Dube disposed of his gun along the way by tossing it in a river. Dr. Bishop was apparently unaware of these details indicating deliberation. Dr. Voss heard Mrs. Kyllonen's testimony but believed Dube could have planned out a much better robbery, although he could not suggest how.

5. Dr. Voss testified:

"Q. Well, you wouldn't expect ordinary people to think that that was the act of a crazy person would you?
A. I wouldn't know what an ordinary person would think. I would think that the man might be crazy at that point.
Q. Because he robbed a bank?
A. No, I don't say that anybody who robs a bank is crazy, but I would suspect that the person doing it might be under some emotional disorder. I don't know. You would have to see the person."

And Dr. Bishop testified "If a rational person were going to rob a bank, to me that's a rather logical contradiction. . . ."

before and after the crime. She had lived with Dube for several weeks and was in his company when he fled. While the defense argues that by selecting a bank to rob on the spur of the moment, Dube behaved in a bizarre manner, this behavior does not necessarily compel an inference of mental abnormality; and his conduct during and after the robbery, including precautions to avoid detection such as discarding the gun and driving to a city where he felt the police were less likely to be on the lookout, seems rational enough. The two tellers, who saw him briefly during the robbery, observed nothing bizarre, and the jury was able to add to this evidence its own observations of Dube while in the courtroom. Thus, there was evidence that Dube at certain times had behaved in a way which, to the average eyes, might seem normal. Still one wonders by what standard the fleeting glimpses of behavior transmitted by Dube's girl friend and the tellers allowed a finding of sanity beyond a reasonable doubt.* Dr. Voss, the psychiatrist, testified that the girl friend's version of Dube's behavior was consistent with a diagnosis of schizophrenia. Whether or not that is so, it is questionable whether her association with Dube was extensive enough, and her behavioral testimony detailed enough, to permit a positive diagnosis of sanity either by a layman or an expert.

Yet not without some hesitation I think the jury was entitled to receive help from another quarter. In *Davis v. United States,* 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895), the Supreme Court did not characterize the presumption of sanity as belonging to that category of presumption which vanishes once the defense shows evidence of insanity. Instead, it stated,

"If the whole evidence, *including that supplied by the presumption of sanity,* does not exclude beyond a reasonable doubt the hypothesis of insanity, of which some proof is adduced, the accused is entitled to an acquittal. . . ."

160 U.S. at 488, 16 S.Ct. at 358 [Emphasis supplied].

Except for the quoted reference in *Davis* (which was the case that established the federal rule requiring the prosecution to prove sanity beyond a reasonable doubt) there has been little attention paid in federal cases to whether the presumption of sanity, once questioned, continues to have evidentiary force. Some courts, like the court here, see it as a presumption that evaporates once evidence of insanity is introduced. Yet viewed as a common sense inference that a person without marked symptoms to the contrary is likely to be sane, I think the presumption is entitled to be given reasonable weight in determining whether on all the evidence the Government gets to a jury.

Massachusetts courts have for years relied upon the presumption of sanity as sufficient to take a case to the jury notwithstanding an absence of affirmative evidence of sanity. *See, e. g., Commonwealth v. Masskow,* Mass., 290 N.E.2d 154, 159 (1972). *But cf. Commonwealth v. Mutina,* Mass., 323 N.E.2d 294, 297 n. 2 (1975) (questioning but not deciding

---

* Our approach is not easily reconciled with that taken in *Beltran v. United States,* 302 F.2d 48 (1st Cir. 1962), in which Judge Aldrich wrote, 302 F.2d at 52,

"The introduction of evidence of insanity places a burden on the government of proving sanity beyond a reasonable doubt. . . This burden cannot be spirited away by the simple method proposed by the government of the court's saying it does not believe the evidence, therefore there is no evidence, therefore there is no burden . . . [S]uch thinking would render the whole principle meaningless. Rather, the record must be looked at as a whole, with the burden on the government to overcome any reasonable doubt."

*Beltran* was, however, on its facts a stronger case for the defense. The diagnosis of paranoid schizophrenia had been made at about the time of the crime and was subsequently confirmed. It was accepted by the court with respect to Beltran's competency to stand trial for a different offense. Nonetheless, I think it fair to say that our approach in the present case is closer to Judge Magruder's dissenting opinion in *Beltran* than to the court's.

the continued viability of this doctrine in light of *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)). Cases such as *Winship* and, most recently, *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), call into question the use of devices designed to shift the Government's burden of proof. Still the presumption of sanity in the limited sense suggested states a commonly perceived probability and can be distinguished from a mere contrivance to undercut the Government's burden.

Moreover, the approach falls well short of the rule adopted by England, Canada and many states that insanity is an affirmative defense, the burden of proving which is on the defense. That rule, while different from that applied in federal prosecutions, was held constitutional in *Leland v. Oregon,* 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952), and *Leland* was defended as being still good law by Mr. Justice Rehnquist in his concurring opinion in *Mullaney v. Wilbur, supra.*

In the present case, given the evidence of an ability to function normally, and an absence of evidence of abnormal behavior, I think the jury could summons assistance from the inference, or presumption, that Dube was sane. Evidence bearing upon insanity has never been restricted to expert evidence. Conduct, lay observations and even lay opinions have traditionally been given much weight. 2 J. Wigmore, Evidence, §§ 227 et seq. (3d ed. 1940). And the jury could add to factors such as the reasonableness of Dube's conduct before and after the crime and his apparent lack of any history of mental disturbance, an inference of sanity drawn from its common experience that most people (at least those without marked outward symptoms) are sane. With the aid of this inference it could ·reach the conclusion that he was sane beyond a reasonable doubt. I recognize that this rationale is not without its difficulties, but it seems more satisfying than to pretend that the Government's meager evidence of Dube's conduct established, or could establish, by itself, much of anything.

Had there been somewhat less evidence of ordinary behavior, or slightly stronger evidence of abnormality, reversal might be in order. But without condoning the Government's failure to call an expert or otherwise bolster its case I think the issue was properly submitted to the jury.