COMMONWEALTH *vs.* PAUL H. KOSTKA.

Middlesex.    March 1, 1976. — June 23, 1976.

Present: HENNESSEY, C.J., REARDON, QUIRICO, BRAUCHER,
KAPLAN, WILKINS, & LIACOS, JJ.

*Insanity.   Constitutional Law,* Due process of law, *Practice, Criminal,*
Defendant's competence to stand trial, Capital case, Charge to jury.
*Homicide.   Evidence,* Presumptions and burden of proof, Of sanity.
*Identification.*

At a murder trial, testimony by a psychiatrist, who had examined the
defendant numerous times over a period of time, that the defendant
understood the charges against him and was able to cooperate with
his attorney supported the judge's finding that the defendant was
competent to stand trial. [522-523]
At a murder trial, there was no error in the denial of a motion to sup-
press an out-of-court identification of the defendant by a witness
who had been shown twelve photographs, two of which were pictures
of the defendant, even though the defendant's pictures were the
only duplicates shown to the witness, where the identification was
less than a week after she had seen the defendant and where she
had previously given an accurate description of the defendant to the
police. [523-524]
A defendant whose murder trial was held prior to this court's decision
in *Commonwealth* v. *Mutina,* 366 Mass. 810 (1975), was not entitled

to an instruction on the consequences of a verdict of not guilty by reason of insanity. [524-525]

Discussion of the nature and purpose of the presumption of sanity and its application in criminal cases in the Commonwealth. [526-530]

Even though the Commonwealth must prove a criminal defendant was sane beyond a reasonable doubt at the time he committed the crime after a defendant has raised the issue of insanity, the submission of the presumption of sanity to the jury does not violate due process of law. [530-537]

At a trial on indictments charging first degree murder and armed robbery, where there was evidence that the defendant engaged in a carefully considered, intelligent plan to commit the crimes, the defendant's evidence of insanity was not so compelling as to make reversal under G. L. c. 278, § 33E, appropriate. [537-539] HENNESSEY, C.J., dissenting, with whom KAPLAN, J., joined.

INDICTMENTS found and returned in the Superior Court on June 14, 1972.

The cases were tried before *Dimond, J.*

*Paul A. D'Agostino, Jr.,* for the defendant.

*Alan L. Kovacs,* Assistant District Attorney, for Commonwealth.

HENNESSEY, C.J.    Kostka was found guilty of murder in the first degree, armed robbery, and two counts of assault with a dangerous weapon. His appeal is before us pursuant to G. L. c. 278, §§ 33A-33G.

On appeal, Kostka presents the following as error: (1) the trial judge's finding that he was competent to stand trial; (2) the trial judge's allowance of testimony of an out-of-court identification and an in-court identification by a Mrs. Eunice Silverman; (3) the trial judge's refusal to give instructions on the consequences of a verdict of not guilty by reason of insanity; and (4) the trial judge's refusal to direct a verdict of not guilty by reason of insanity. We conclude that there was no error in the trial judge's actions.[1]

Before considering the issues raised on appeal, we set out the facts adduced at trial. On April 15, 1972, about

---

[1] The author of this opinion concurs that there is no error, but disagrees with the court's conclusion that no discretionary relief should be afforded under G. L. c. 278, § 33E. For that reason, unusually enough, the author has filed a separate dissenting opinion, *infra,* as to that one factor.

10 P.M., two teenage girls, Diane Kaplan and Nancy Habeeb, entered the Salem Street Variety Store in Malden. At that time Murray Cohen was standing behind the counter and a man they later identified as Kostka was standing in front of it. While the two girls were standing at the ice-cream chest, they heard a shot. After they turned around, they heard two more shots and saw Murray Cohen collapse. Kostka then turned toward the girls, pointed his gun at them, and told them to move toward the telephone booth. He then reached behind the counter and grabbed a bag which sounded to the girls as if it contained cash. On his way out of the store Kostka told the girls that if they said anything he would kill them too. Murray Cohen died as a result of the shooting.

Three days later, on April 18, both girls were taken to State police headquarters in Boston where, after viewing hundreds of pictures, they identified pictures of Kostka. Later that day Kostka was arrested by a Boston police officer.

Kostka was also identified by a Mrs. Eunice Silverman, the wife of the owner of the store, who, in response to a composite picture published in a Malden newspaper, called the Malden police to report that she had seen a man fitting the composite description in the store the night before the murder. Mrs. Silverman testified that she was working in the store that evening when, about 10:15 P.M., fifteen minutes before closing time, a man entered the store, stood around the magazine rack for several minutes, and then purchased some potato chips, a pack of cigarettes, and a magazine. Mrs. Silverman testified that the man was in the store for about five or ten minutes and that she observed him closely because she was uneasy about someone entering the store that close to closing time. She also testified that she engaged the man in a brief conversation before he left.

At the time the man entered the store there was another person, who was waiting to take Mrs. Silverman home, present; before that person left, a third person entered

the store. After Mrs. Silverman saw the composite photo-
graph in a local paper several days later, she called the
police, and told them that she was "pretty sure" that a
man who had been in the store the night before the mur-
der was the man in the composite drawing. The police
came to her home shortly thereafter with about twelve
black and white photographs of white males. Two of the
twelve pictures were of the defendant — one photograph
with glasses on and another without. Of the other ten
photographs, there were no duplicates. Mrs. Silverman
picked out the two pictures of Kostka. However, it was
not until the next day that the police notified her that
she had picked out pictures of the suspect.

The evidence presented by Kostka was almost exclu-
sively concerned with his defense of insanity. There was
testimony from a number of lay witnesses and from two
psychiatrists; additionally, extensive medical records were
produced. Without setting out all the evidence produced
by the defense, we shall attempt to summarize the evidence
on insanity.

Kostka's mother testified to years of difficulty with her
son, starting at age three or four. Kostka had continual
problems at school, was disruptive and violent, and was
sent to the Middlesex Training School at age nine. He
stayed there for about two years, having been classified
as a habitual school offender. Although Kostka returned
to the Malden public schools at age fourteen, he remained
in school for only two months. One year later he was re-
ferred to a special program for emotionally disturbed
children.

A series of hospital admissions began in 1964, when
Kostka was fourteen. Over the next five years Kostka
had ten admissions — six at Bridgewater State Hospital
(Bridgewater), and two each at Foxborough State Hospi-
tal and Metropolitan State Hospital. The admissions lasted
from one to seventeen months. Some were the result of
prison, court or school references, but most were requested
under the provisions of G. L. c. 123. The diagnoses varied

from "emotionally unstable personality" to "sociopathic personality" to "schizoid personality." At no time did the diagnoses state that Kostka was overtly psychotic.

After Kostka was arrested for the murder of Murray Cohen, he was initially incarcerated in the Billerica House of Correction. About a month later, because of disruptive conduct there, he was sent to Bridgewater State Hospital. After several weeks of observation, during which Kostka refused to take psychological tests, the staff issued a provisional diagnosis in which they concluded that the defendant had an "[a]nti-social personality disorder, severe, with schizoid and unstable features, possibly decompensating into schizophrenia, paranoid type." At that time (June, 1972), Kostka was considered by the staff to be incompetent to stand trial. He remained at Bridgewater.

In September, 1972, a staff report reaffirmed the previous diagnosis, but noted that Kostka was "well oriented and in good contact with reality." In January, 1973, a further review of Kostka's condition resulted in the same basic diagnosis, but concluded that he was then competent to stand trial. In March, after spending nine months at Bridgewater, pursuant to his own request, he was transferred back to Billerica. Six days later Kostka returned to Bridgewater on the basis of a request by the prison physician. Reevaluation of Kostka's condition resulted in a reaffirmation of previous diagnoses.

In addition to these medical records and staff evaluations, Kostka presented two experts.[2] A Dr. James Christy, the acting medical director of Bridgewater at the time of trial, testified that he had known Kostka for a period of time and that he had examined him on numerous occasions. In June, 1972, Dr. Christy felt that Kostka was "on his way to psychosis." However, Dr. Christy did not find Kostka to be in a continual state of psychosis.[3] While Dr.

---

[2] Kostka also presented a number of lay witnesses who testified to certain events. Their testimony need not be summarized here.

[3] Dr. Christy noted that Kostka had been "off and on medication" over a period of time. There was also testimony that, on the night of

Christy did conclude at trial that the defendant, then twenty-three years old, was "presently mentally ill" and that he probably had been since he was nine or ten years old, Dr. Christy did not have an opinion whether Kostka was criminally responsible on the date of the crime.

The defendant's other expert, Dr. Robert Mezer, testified that he first examined Kostka in February, 1973. Dr. Mezer expressed his belief that Kostka suffered from chronic paranoid schizophrenia, resulting in the loss of "contact with reality" and "difficulty in adjusting to the requirements [of] life as most people know it." Dr. Mezer disagreed with the other doctors' diagnoses of Kostka: he felt Kostka was not simply a sociopath. He concluded that Kostka was not criminally responsible on the date of the crime under the test set forth in *Commonwealth* v. *Mc-Houl*, 352 Mass. 544 (1967). He stated that Kostka was suffering from "paranoid schizophrenia," a "major psychotic illness." Kostka was thus "not able to conform his conduct to the requirements of the law because of his mental illness." Dr. Mezer based this conclusion on observation and evaluation of Kostka's "entire illness" and Kostka's statements, in February, 1973, about his mental state on the date of the crime.

To rebut this substantial evidence on the issue of insanity, the Commonwealth first called Mrs. Silverman to testify. The Commonwealth argues that her testimony, in addition to identifying Kostka as the man in the store the night before the murder, would permit the inference that Kostka might have been sane because he planned to rob the store when only he and a salesperson would be there.

A registered nurse at Bridgewater also testified in rebuttal. She said that she had known Kostka for about two years. Kostka never caused any difficulties for her, she stated, but he did say that at times he had problems.

Finally, a correction officer at Bridgewater testified that he had cared for Kostka for the three weeks prior to trial. The officer stated that Kostka had actively participated

October 15, 1973, Kostka ingested part of a light bulb. This resulted in the jury selection process being delayed for several days.

with other patients in sports, that he had worked in the print shop, and was neat in appearance. The officer indicated that Kostka did not cause any disturbances during this period — while being confined in a minimum security building — but he did note that Kostka was on medication.

Having set out the facts of the crime and summarized the evidence of insanity, we turn now to the issues raised on appeal.

1. *Competence to Stand Trial.*

Kostka first argues that the trial judge's finding that he was competent to stand trial was erroneous. "The test to be applied in determining the competence of the defendant is 'whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him.'" *Commonwealth* v. *Vailes*, 360 Mass. 522, 524 (1971), quoting from *Dusky* v. *United States*, 362 U.S. 402 (1960). When there is doubt as to whether the defendant satisfies this test, the judge must, on his own initiative, conduct a full hearing on the issue (*Pate* v. *Robinson*, 383 U.S. 375, 385 [1966]; *Commonwealth* v. *Vailes*, *supra* at 524) and "[a] finding of incompetency shall require a preponderance of the evidence." G. L. c. 123, § 15 (*d*), as amended through St. 1973, c. 569, § 7. On the evidence adduced here, we conclude that the trial judge was clearly warranted in finding that Kostka was competent to stand trial.

Although there are indications that, at various points prior to trial, Kostka was considered by those treating him to be incompetent to stand trial, the test set out in *Dusky* is concerned with present abilities. See *Pate* v. *Robinson*, *supra* at 387. Consequently, the question is whether Kostka was competent to stand trial at the actual time of trial in October, 1973. Support for the trial judge's conclusion may be found in the testimony of Dr. Christy, the acting director of Bridgewater State Hospital. Although Dr. Christy recognized that Kostka had an "anti-social personality" with "early signs of schizophrenia," he was of the opinion that Kostka was competent to stand trial. Dr. Christy

testified that Kostka understood both the charges against him and the nature of the proceedings; that he was able to confer with his attorney "with a reasonable degree of rational understanding"; and that he was "very capable" of cooperating with his attorney. These conclusions draw strong support from the fact that Dr. Christy had known Kostka over a period of time and was quite familiar with his medical history.

Dr. Mezer reached the opposite conclusion. However, unlike Dr. Christy, Dr. Mezer had not had an ongoing relationship with Kostka. Rather, he based his conclusions on two brief examinations of Kostka — a total of two and one-half hours — one of which was eight months before trial. Additionally, Dr. Mezer stated that only five or ten minutes of his initial examination was consideration of the question of Kostka's competence to stand trial.

We conclude that, on the basis of the evidence, there was ample support for the trial judge's finding that Kostka was competent to stand trial. Accordingly, Kostka was not denied any due process rights in this regard. See *Commonwealth* v. *Vailes, supra* at 524, and cases cited.

2. *Identification by Mrs. Silverman.*

Kostka's second contention on appeal is that the trial judge erred by not suppressing testimony of the out-of-court identification made by Mrs. Silverman and by allowing Mrs. Silverman to make an in-court identification.

As we have previously noted, Mrs. Silverman called the Malden police after she saw a composite drawing of the suspected murderer in the local newspaper about four days after the crime. The next day a Captain Cornelius Buckley came to Mrs. Silverman's home with about a dozen photographs of white males between the ages of twenty and twenty-eight, some with glasses and others without glasses. At the voir dire and at trial Mrs. Silverman testified that the photographs were randomly placed on her kitchen table and that she selected two photographs of Kostka — one with glasses and one without. In arguing that the procedure employed by the Malden police was "impermissibly suggestive," see *Simmons* v. *United States,* 390 U.S.

377, 384 (1968), Kostka places substantial reliance on the fact that, of the dozen or so photographs shown to Mrs. Silverman, the only duplicates were of him.

We note that such a practice is not impermissibly suggestive per se. See *United States* v. *Cooper,* 472 F.2d 64, 65-66 (5th Cir. 1973). Cf. *Commonwealth* v. *Mobley,* 369 Mass. 892, 896 (1976). Nor was the fact that only two of the photographs were of men wearing glasses enough to make the procedure constitutionally defective under *Simmons,* particularly in light of the fact that Mrs. Silverman picked out a picture of Kostka without glasses.

Furthermore, the out-of-court identification of photographs less than a week after the crime was close to the time Mrs. Silverman had seen Kostka in the store (the night before the crime). Before the composite drawing appeared in the local newspaper, she had spoken to the police (on the night of the crime) and given them an accurate description of Kostka.

Because of our conclusion that the trial judge was warranted in ruling, as he did, that the pre-trial identification process was valid, we need not determine whether the "in-court identification was, by clear and convincing evidence, based on observations of the [defendant] independent from the challenged pre-trial procedures." *Commonwealth* v. *Mobley, supra* at 897 (footnote omitted). We do note that Mrs. Silverman testified on voir dire that she remembered the defendant's face "as clear as a bell" and she later stated in open court that there was "[n]o question in [her] mind" that the defendant was the person who had been in the store the night before the murder. On the entire evidence, it is very clear that this was not a case in which there was "a very substantial likelihood of irreparable misidentification." *Simmons* v. *United States, supra* at 384; *Commonwealth* v. *Mobley, supra* at 895.

3. *Instructions on the Consequences of a Verdict of Not Guilty by Reason of Insanity.*

Kostka's third assignment of error is the trial judge's refusal to give instructions on the consequences of a verdict of not guilty by reason of insanity. Kostka bases this as-

signment of error on our decision in *Commonwealth* v. *Mutina,* 366 Mass. 810, 822 n.12 (1975), in which we held that "in all trials and retrials after this date where the defense of insanity is fairly raised, the defendant, on his timely request, is entitled to an instruction regarding the consequences of a verdict of not guilty by reason of insanity." Because Kostka's trial was held in October and November of 1973, over one year before our decision in *Mutina,* Kostka was not entitled to such an instruction, *id.* at 811-812, 823 n.12, and there was therefore no error in this regard.

4. *The Defense of Insanity.*

Kostka's final contention is that the trial judge erred in denying his motion for a directed verdict of not guilty by reason of insanity, because the Commonwealth failed, as matter of law, to prove him sane beyond a reasonable doubt. Kostka presents a two-step legal analysis in reaching this conclusion. He argues first that, when the issue of insanity is properly before the trier of fact, the Supreme Court's decision in *In re Winship,* 397 U.S. 358 (1970), makes the rule that the prosecution must prove sanity beyond a reasonable doubt one of constitutional dimension. His argument then centers on a footnote in *Commonwealth* v. *Mutina, supra,* 366 Mass. at 814 n.2. From this he argues that the Commonwealth may not constitutionally satisfy that burden by reliance — in whole or in part[4] — on the so called "presumption of sanity,"[5] in a case where there

---

[4] The Commonwealth argues that it did not rely solely on the "presumption of sanity" to prove Kostka sane beyond a reasonable doubt. It points to the testimony of Mrs. Silverman — from which it could be inferred that Kostka engaged in a rational, intelligent plan to rob the store — and to that of the nurse and correction officer.

[5] Although it is necessary to use the term "presumption" in order to relate our discussion to other jurisdictions and to various texts, we do not, and have not in the past, suggested the use of the term "presumption" in jury instructions. The instruction which we have repeatedly approved, and approve once more in this case, is one which permits the jury to consider that a great majority of men are sane and the probability that any particular man is sane. See cases cited *infra.* For an outline of a charge to a jury on the insanity issue, see *Commonwealth* v. *Costa,* 360 Mass. 177, 185-186 (1971).

has been uncontradicted *expert* testimony that the defendant was insane at the time the crimes were committed. Kostka concludes that, because the Commonwealth could not rely on the presumption of sanity to meet its burden on the issue of sanity and because the other evidence of sanity was so tenuous, a directed verdict was appropriate.[6]

While we agree that under Massachusetts law the Commonwealth must, when the defense of insanity has been raised, prove a defendant sane beyond a reasonable doubt, we do not agree that *Winship, Mutina,* or the recent Supreme Court cases referred to in *Mutina* compel the conclusion that the Commonwealth may not rely on the "presumption of sanity" to meet its burden even in a case where there is uncontradicted expert testimony that the defendant was insane at the time he committed the crime in question.

As part of our consideration of the impact of *Winship* and other recent Supreme Court decisions on the presumption of sanity as it is employed in Massachusetts, it is essential to examine the presumption of sanity as it has developed both generally and in Massachusetts, and we turn first to that examination.

(a) *The General Purpose and Nature of the "Presumption of Sanity."*

In *Davis* v. *United States,* 160 U.S. 469, 486 (1895), the Court stated: "[T]he law presumes that every one charged with crime is sane, and thus supplies in the first instance the required proof of capacity to commit crime." That the prosecution may rely on the presumption in the absence

---

[6] In support of this conclusion, Kostka relies almost exclusively on the recent New York Court of Appeals decision in *People* v. *Silver,* 33 N.Y.2d 475 (1974). While it is true that the court in *Silver* ordered that the indictment be dismissed, see *id.* at 483, the court based this on its statement that "[t]he fact that the prosecutor chose to rely on the presumption rather than meet ... [the defendant's evidence of insanity] with contradictory proof is inexplicable." However, the court left standing the traditional New York rule that the presumption may be submitted to the jury for their consideration, see *id.* at 482, a proposition which Kostka challenges on appeal. Consequently, *Silver* may not be so helpful to Kostka as his brief suggests it is.

of any evidence tending to show insanity is the rule in all jurisdictions. W.R. LaFave & A.W. Scott, Jr., Criminal Law § 40, at 312 (1972). H. Weihofen, Mental Disorder as a Criminal Defense 214-215 & n.1 (1954), and cases cited. See Annot., 17 A.L.R.3d 146, 167 (1968). Although all jurisdictions consider insanity to be a defense and apply the "presumption of sanity" in a manner that makes it conclusive on the issue of sanity until some evidence tending to show insanity is adduced,[7] at that point the unanimity among jurisdictions ceases to exist.

Twenty-eight jurisdictions, including the Federal government and Massachusetts, provide that, after evidence of insanity has been introduced into the case, the burden devolves on the prosecution to prove the defendant's sanity beyond a reasonable doubt.[8] Twenty-three jurisdictions, including the District of Columbia, consider insanity to be an affirmative defense, and require that the defendant

---

[7] Such evidence may enter the case during the prosecution's case in chief, either as a result of the prosecutor's direct questioning or the defense's cross-examination of prosecution witnesses. W.R. LaFave & A.W. Scott, Jr., Criminal Law § 40, at 312-313 (1972). See Annot., 17 A.L.R.3d 146, 170-171 (1968), and cases cited.

[8] *Commonwealth* v. *Mutina,* 366 Mass. 810, 814 n.2 (1975). *Davis* v. *United States,* 160 U.S. 469, 488 (1895). *Dolchok* v. *State,* 519 P.2d 457, 458 (Alas. 1974). *State* v. *Cooper,* 111 Ariz. 332, 334 (1974). *People* v. *Johnson,* 180 Colo. 177, 178 (1972). *State* v. *Davis,* 158 Conn. 341, 355-356 (1969), vacated in part, 408 U.S. 935, on remand, 163 Conn. 642 (1972). *Byrd* v. *State,* 297 So.2d 22, 23 (Fla. 1974). *State* v. *Moeller,* 50 Hawaii 110, 121 (1967). *State* v. *Myers,* 94 Idaho 570, 573 (1972). *People* v. *Bassett,* 56 Ill.2d 285, 296 (1974). *Stamper* v. *State,* 260 Ind. 211, 213 (1973). *State* v. *Thomas,* 219 N.W.2d 3, 5 (Iowa, 1974). *State* v. *Lamb,* 209 Kan. 453, 473 (1972). *Robinson* v. *State,* 249 Md. 200, 225-226, cert. denied, 393 U.S. 928 (1968). *People* v. *Livingston,* 57 Mich. App. 726, 732 (1975). *Warren* v. *State,* 285 So.2d 756, 758 (Miss. 1973). *State* v. *Jacobs,* 190 Neb. 4, 6, cert. denied, 414 U.S. 860 (1973). *State* v. *Snow,* 98 N.H. 1, 4 (1953). *State* v. *Lujan,* 87 N.M. 400, 403 (1975). *People* v. *Silver,* 33 N.Y.2d 475, 479 (1974). *Whisenhunt* v. *State,* 279 P.2d 366, 371 (Okla. Crim. 1954). *Commonwealth* v. *Demmitt,* 456 Pa. 475, 482-483 (1974). *State* v. *Kindvall,* 86 S.D. 91, 95 (1971). *Collins* v. *State,* 506 S.W.2d 179, 184 (Tenn. Crim. App. 1973). *State* v. *Holt,* 22 Utah 2d 109, 111 (1969). *State* v. *Miner,* 128 Vt. 55, 67 (1969). *Rice* v. *State,* 500 P.2d 675, 676 (Wyo. 1972). N.D. Century Code §§ 12.1-01-03, 12.1-04-03 (Supp. 1975).

prove insanity by a preponderance of the evidence.[9] One
jurisdiction, Wisconsin, employs both of these rules, de-
pending on which definition of insanity the defendant
relies on.[10]

There is further differentiation among those jurisdic-
tions, like Massachusetts, in which the prosecution bears
the ultimate burden on the issue of insanity. In some juris-
dictions, including a majority of the Federal circuits, after
a certain quantum of evidence tending to show insanity
has been introduced,[11] the presumption loses all effect.[12]
However, in at least seven other jurisdictions, of which
Massachusetts is one, the "presumption of sanity" does

---

[9] United States v. Greene, 489 F.2d 1145, 1152 (D.C. Cir. 1973), cert.
denied, 419 U.S. 977 (1974). Griffin v. State, 284 Ala. 472, 475 (1969).
Stewart v. State, 233 Ark. 458, 460-461, cert. denied, 368 U.S. 935
(1961). In re Franklin, 7 Cal.3d 126, 141 (1972) (separate trial on
insanity). Ray v. State, 262 A.2d 643, 645-646 (Del. 1970). Riggins v.
State, 226 Ga. 381, 382 (1970). Henderson v. Commonwealth, 507
S.W.2d 454, 458 (Ky. 1974). State v. Link, 301 So.2d 339, 341 (La.
1974). State v. Melvin, 341 A.2d 376, 379 (Me. 1975). State v. Hoskins,
292 Minn. 111, 133 (1972). State v. King, 526 S.W.2d 58, 59 (Ct. App.
Mo. 1975). State v. Olson, 156 Mont. 339, 344 (1971). Phillips v. State,
86 Nev. 720, 722 (1970). State v. DiPaglia, 64 N.J. 288, 293 (1974).
State v. Potter, 285 N.C. 238, 249 (1974). State v. Johnson, 31 Ohio St.
2d 106, 117 (1972). State v. Unsworth, 235 Ore. 234, 237 (1963). State
v. Page, 104 R.I. 323, 330 (1968). State v. Hinson, 253 S.C. 607, 620
(1970). Hogan v. State, 496 S.W.2d 594, 597 (Tex. Crim. App.), cert.
denied, 414 U.S. 862 (1973). Bloodgood v. Commonwealth, 212 Va. 253,
254 (1971). State v. Canaday, 79 Wash.2d 647, 677 (1971). State v.
Camp, 110 W. Va. 444, 451 (1931).

[10] State ex rel. Schopf v. Schubert, 45 Wis.2d 644, 648 (1970) (bur-
den on State under M'Naghten test; burden on defendant under Model
Penal Code test).

[11] The amount of evidence necessary to vitiate the presumption varies
within these jurisdictions. Some jurisdictions require only "some" or
"slight" evidence of insanity, while others require evidence that raises
a "reasonable doubt" as to the defendant's sanity. Annot., 17 A.L.R.3d
146, 172-177 (1968 & Supp. 1975), and cases cited. The latter rule ap-
pears to be the majority rule within these jurisdictions. W.R. LaFave
& A.W. Scott, Jr., Criminal Law § 40, at 313 (1972).

[12] See, e.g., United States v. Dube, 520 F.2d 250, 251 (1st Cir. 1975);
United States v. Shackelford, 494 F.2d 67, 70 (9th Cir.), cert. denied,
417 U.S. 934 (1974); United States v. Jacobs, 473 F.2d 461, 464 (10th
Cir.), cert. denied, 412 U.S. 920 (1973); Byrd v. State, 297 So.2d 22,
23 (Fla. 1974); Commonwealth v. Demmitt, 456 Pa. 475, 482 (1974).

not disappear from the case. Rather, the "presumption" is considered to have at least some evidential value.[13]

In those jurisdictions which place the burden of proving insanity by a preponderance of the evidence on the defendant, it is generally thought to be appropriate to allow the jury to consider the presumption.[14]

Because of these differences among the jurisdictions, it is difficult to make precise generalizations about the purpose and nature of the presumption on the basis of case law and statutes. Nor are the commentators in accord about the presumption. Compare W.R. LaFave & A.W. Scott, Jr., Criminal Law § 40, at 312 (1972), with A. Goldstein, The Insanity Defense 120-121 (1967), and H. Weihofen, Mental Disorder as a Criminal Defense 214-219 (1954). Indeed, one leading commentator has concluded that the "use of the term presumption is only confusing." McCormick, Evidence § 346, at 830 (1972).

Although no precise rules governing the presumption in all jurisdictions can be stated with complete accuracy, two general conclusions can be drawn. First, the presumption, as it has traditionally been employed, may, in any given jurisdiction, have procedural or evidential characteristics, or both. Second, the historic and continued variation among jurisdictions suggests that the purpose and nature of the presumption have traditionally been considered to be matters to be defined by courts and Legislatures as

---

[13] *Commonwealth* v. *Smith,* 357 Mass. 168, 179-180 (1970). *Keys* v. *United States,* 346 F.2d 824, 826 (D.C. Cir.), cert. denied, 382 U.S. 869 (1965). *State* v. *Daniels,* 106 Ariz. 497, 501-502 (1970). *State* v. *Lass,* 228 N.W.2d 758, 768 (Iowa 1975). *People* v. *Gray,* 57 Mich. App. 289, 296 (1975). *State* v. *Wilson,* 85 N.M. 552, 555 (1973). *People* v. *Silver,* 33 N.Y.2d 475, 482 (1974). See *Davis* v. *United States,* 160 U.S. 469, 488 (1895).

[14] H. Weihofen, Mental Disorder as a Criminal Defense 219 (1954) ("in the[se] jurisdictions ... the presumption of sanity [or at least the inference of sanity] does weigh against evidence ..."). See *Bradford* v. *State,* 234 Md. 505, 513 (1964) (in such jurisdictions "the presumption of sanity is an inference of fact from which the trier of facts can draw conclusions of fact"). See also *State* v. *King,* 526 S.W.2d 58, 59 (Mo. App. 1975); Note, Burden of Proof of Insanity in Criminal Cases, 15 Md. L. Rev. 157, 160-161, 163-164 (1955).

part of a jurisdiction's criminal law, rather than by the Constitution.

Nevertheless, there are constitutional limitations on a State's ability to define its criminal law and procedure. See *Mullaney* v. *Wilbur,* 421 U.S. 684 (1975); cf. *In re Winship,* 397 U.S. 358 (1970). However, the imposition of such limitations — through the due process clause of the Fourteenth Amendment — is rare: "state courts are the ultimate expositors of state law ... except in extreme circumstances." *Mullaney* v. *Wilbur, supra* at 691 & n.11, citing *Winters* v. *New York,* 333 U.S. 507 (1948), and *Murdock* v. *Memphis,* 87 U.S. (20 Wall.) 590 (1875). The specific question we must address is whether the presumption of sanity, as employed in Massachusetts, violates due process. In order to make that inquiry we must first set out the specific purpose of the presumption as developed in the Commonwealth.

(b) *The Role of the "Presumption of Sanity" in Massachusetts.*

In Massachusetts, the "presumption of sanity" operates procedurally while the facts underlying it operate substantively. As in all jurisdictions, the presumption relieves the prosecution from adducing evidence of sanity in those cases in which the question is not raised. In cases where the question of insanity is raised, as in the instant case, the facts underlying the presumption and the inference that may be drawn from those facts provide a basis for the jury to determine that the defendant was sane beyond a reasonable doubt at the time the crime was committed. In this sense, the "presumption of sanity" is merely an expression we have used to describe both "the fact that a great majority of men are sane," *Commonwealth* v. *Clark,* 292 Mass. 409, 415 (1935), and "the probability that any particular man is sane," *id.,* from which the jury may conclude that the defendant is sane. See *Commonwealth* v. *Mutina,* 366 Mass. 810, 814 n.2 (1975); *Commonwealth* v. *Cox,* 327 Mass. 609, 613 (1951). Furthermore, our past decisions make it clear that it is not the presumption itself that is weighed as evidence; rather, the jury weigh the facts un-

derlying the presumption and the inferences that may follow from those facts (*Commonwealth* v. *Mutina, supra; Commonwealth* v. *Cox, supra; Commonwealth* v. *Clark, supra;* see H. Weihofen, Mental Disorder as a Criminal Defense 217 [1954]), facts which are considered to be part of the jury's "common experience that most people ... are sane." *United States* v. *Dube,* 520 F.2d 250, 255 (1st Cir. 1975) (Campbell, J., concurring).

Because the presumption serves two purposes in the Commonwealth, we do not think that it can be accurately classified as a presumption. Similarly, although an inference may be drawn from the facts underlying the presumption, we do not think that the presumption and the facts underlying it may be properly termed an inference. We recognize that the "presumption of sanity" shares, but is not limited to, the characteristics of both presumptions and inferences. We are reluctant to attempt to classify the "presumption of sanity" more precisely, and we do not believe that such classification would be helpful to our present inquiry.

Having set out the role of the presumption and the facts underlying it, we turn now to the question whether use of the presumption in Massachusetts constitutes a violation of due process in light of *In re Winship,* 397 U.S. 358 (1970), and other relevant cases.

(c) *The Effect of Winship and Other Supreme Court Cases.*

The critical language in *Winship* is the court's explicit holding that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." 397 U.S. at 364. It has long been the law of this Commonwealth that, when the defendant's sanity is in issue, the prosecution bears the burden of proving sanity beyond a reasonable doubt. In *Commonwealth* v. *Johnson,* 188 Mass. 382, 388 (1905), it was said that the "statement ... that the burden of proof was upon the Commonwealth to satisfy [the jury] beyond a reasonable doubt that [the defendant] was ... sane ...

[was] the law...fully and correctly stated." See also
*Davis* v. *United States*, 160 U.S. 469, 483 (1895). That the
burden is on the Commonwealth has often been reiterated.
See, e.g., *Commonwealth* v. *Mutina*, 366 Mass. 810, 814
n.2 (1975); *Commonwealth* v. *Smith*, 357 Mass. 168, 177
(1970); *Commonwealth* v. *Clark*, 292 Mass. 409, 415
(1935). Even if, under *Winship*, sanity is a "fact" of the
crime in such cases, the effect of *Winship* is not to alter
the prosecution's burden, but to make it one of constitu-
tional proportions.

While we believe that, under *Winship*, sanity becomes
a "fact" of the crime charged after evidence of insanity has
been adduced, we do not believe that sanity is an "ele-
ment" of any given crime.[15] Insanity is a defense to the
crime charged. Although once the issue has been raised it
is necessary for the prosecution to prove sanity beyond a
reasonable doubt, it is not necessary for the prosecution
to prove sanity — nor would instructions on the presump-
tion of sanity be appropriate — before the issue is raised.
See *Davis* v. *United States*, 160 U.S. at 488. This distinc-
tion — between the "elements" of the offense charged and
"facts" which, after *Winship*, the prosecution must prove
beyond a reasonable doubt — is important in determining
the due process standard to be applied to the presumption
of sanity.[16] If sanity were an "element" of the crime

---

[15] We believe that this distinction is consistent with the test we have
adopted for determining whether a defendant is insane. In *Common-
wealth* v. *McHoul*, 352 Mass. 544, 546 (1967), we concluded that the
Model Penal Code definition of insanity was the best statement of our
test for insanity. We do not believe that a defendant's mental disease
or defect which results in his lack of "substantial capacity either to ap-
preciate the criminality [wrongfulness] of his conduct or to conform
his conduct to the requirements of law" (Model Penal Code § 4.01
[Proposed Official Draft 1962]) bears any "necessary relationship to
the existence or nonexistence of the required mental elements of the
crime [charged]." *Mullaney* v. *Wilbur*, 421 U.S. 684, 706 (1975) (Rehn-
quist, J., concurring). See *Leland* v. *Oregon*, 343 U.S. 790, 795 (1952);
*id.* at 804 (Frankfurter, J., dissenting); Gerber, Is The Insanity Test
Insane?, 20 Am. J. Jur. 111, 131-132 (1975); cf. *United States* v.
*Greene*, 489 F.2d 1145 (D.C. Cir. 1973), cert. denied, 419 U.S. 977
(1974).

[16] Although there is such a distinction, it is clear that all of the ele-
ments necessary to prove commission of the offense charged are "facts"

charged, then recent Supreme Court cases on the use of presumptions and inferences to establish an element of the offense would be apposite to our inquiry. Because sanity is not an element of the crime charged, we do not think that cases like *Barnes* v. *United States,* 412 U.S. 837 (1973), *Turner* v. *United States,* 396 U.S. 398 (1970), and *Leary* v. *United States,* 395 U.S. 6 (1969),[17] which concerned the use of statutory and common law inferences to establish an element of the crime charged, set forth the appropriate test. Rather, we think that the appropriate standard is set out in *Leland* v. *Oregon,* 343 U.S. 790 (1952).

In *Leland,* the Supreme Court considered the constitutionality of the then existing Oregon practice of requiring the defendant to prove his insanity beyond a reasonable doubt. The Court concluded that the practice was constitutional. In making that determination, the Court set forth the applicable standard: whether the "policy [in question] violates generally accepted concepts of basic standards of justice." *Id.* at 799. See also *United States* v. *Caldwell,* 543 F.2d 1333 (D.C. Cir. 1974), cert. denied, 423 U.S. 1087 (1976).

Although this standard is of necessity imprecise, *Leland* provides other guidelines that are helpful to our inquiry. The fact that a challenged practice "is followed by a large number of states . . . is plainly worth considering in determining whether the practice 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' " *Leland* v. *Oregon, supra* at 798, quoting from *Snyder* v. *Massachusetts,* 291 U.S. 97, 105 (1934). Cf. *Mullaney* v. *Wilbur,* 421 U.S. 684, 701 (1975). However, the fact that a large number of jurisdictions follow a certain rule "is not conclusive" in such an inquiry. *Leland* v. *Oregon, supra* at 798.

---

within the meaning of *Winship.* See *Mullaney* v. *Wilbur,* 421 U.S. 684, 699 n.24 (1975). But the term "fact" is more inclusive than the term "element." *Winship* is not "limited to a State's definition of the elements of a crime." *Ibid.*

[17] In *Commonwealth* v. *Pauley,* 368 Mass. 286, 292-299 (1975), we discussed these and other related cases at length, and we need not restate our conclusions here.

It is true that only a minority of the jurisdictions requiring the prosecution to prove the defendant's sanity beyond a reasonable doubt — once the issue has been raised by sufficient evidence — allow the jury to consider the presumption or the facts underlying the presumption. But the practice draws support from the Supreme Court's decision in *Davis* v. *United States,* 160 U.S. 469 (1895), a decision which is still frequently cited and which remains vital. See, e.g., *Mullaney* v. *Wilbur, supra* at 702-703 n.31; *United States* v. *Caldwell, supra* 543 F.2d at 1371 (denial of rehearing); *United States* v. *Dube,* 520 F.2d 250, 254 (1st Cir. 1975) (Campbell, J., concurring); *State* v. *Lass,* 228 N.W.2d 758, 768 (Iowa 1975). In *Davis,* the Court explicitly stated that the presumption of sanity possessed evidential value which the jury could consider; thus the Court referred to "the whole evidence, *including that supplied by the presumption of sanity"* (emphasis supplied). 160 U.S. at 488.

The view of the presumption adopted in Massachusetts has also been adopted by the Court of Appeals for the District of Columbia. In *Keys* v. *United States,* 346 F.2d 824, 826 (D.C. Cir.), cert. denied, 382 U.S. 869 (1965), then Circuit Judge Burger wrote: "The presumption of sanity, whatever may be its evidentiary value and weight, does not vanish from the case, as [defendant] would have it. That presumption is grounded on the premise that the generality of mankind is made up of persons within the range of 'normal,' rational beings and can be said to be accountable or responsible for their conduct; this premise is rooted in centuries of experience, has not been undermined by contemporary medical knowledge, and justifies the continuance of the presumption after introduction of evidence of insanity."

In *People* v. *Silver,* 33 N.Y.2d 475, 482-483 (1974), the New York Court of Appeals quoted with approval the case of *Brotherton* v. *People,* 75 N.Y. 159, 163 (1878), for the proposition that, when a jury question as to insanity is presented, " *'the presumption of sanity, and the evidence,*

*are all to be considered.'* " Several other jurisdictions have also reached this result in recent cases, some of which involved due process attacks on the use of the presumption as evidence for the jury's consideration. See *State* v. *Daniels,* 106 Ariz. 497, 501-502 (1970); *State* v. *Lass,* 228 N.W.2d 758, 768 (Iowa 1975); *People* v. *Gray,* 57 Mich. App. 289, 296 (1975); *State* v. *Wilson,* 85 N.M. 552, 555 (1973). Cf. *United States* v. *Dube,* 520 F.2d 250, 255 (1st Cir. 1975) (Campbell, J., concurring).

Although it is true that allowing the jury to consider the presumption is a minority position among the jurisdictions that require proof of sanity beyond a reasonable doubt, it is also true that, in those jurisdictions in which the defendant bears the burden of persuasion on the issue of insanity, the presumption is often submitted to the jury for their consideration. This view was articulated by the Maryland Court of Appeals in *Bradford* v. *State,* 234 Md. 505, 513 (1964), where the court stated that, in jurisdictions in which the burden of persuasion is on the defendant, "the presumption of sanity is an inference of fact from which the trier of facts can draw conclusions of fact." Accord, *State* v. *King,* 526 S.W.2d 58, 59 (Mo. App. 1975). See H. Weihofen, Mental Disorder as a Criminal Defense 216 (1954); Note, Burden of Proof of Insanity in Criminal Cases, 15 Md. L. Rev. 157, 160-161, 163-164 (1955). Thus, it may well be that a majority of jurisdictions in fact submit the presumption to the jury, with the presumption (or the facts underlying it) having some evidential value. We think that, even if this were not the case, our practice would still not run afoul of the *Leland* standards, for there are fundamentally sound reasons for our practice.

First, there are situations in which a jury may justifiably conclude that a defendant is not insane, despite uncontradicted testimony from the defendant's experts that he is insane. In any given case, the jury may have cogent reasons for disbelieving or disregarding such testimony. The defendant's witnesses may have examined him for such a short period of time, at a time so far removed from

the crime, or in such other circumstances that the jury may properly conclude that the testimony is so lacking in credibility or so insufficient in weight that it does not raise a reasonable doubt. That jurors are the ultimate judges of expert testimony and that such testimony is not conclusive are concepts we have recently reaffirmed in cases involving the defense of insanity. *Commonwealth* v. *Costa,* 360 Mass. 177 (1971). *Commonwealth* v. *Smith,* 357 Mass. 168 (1970). *Commonwealth* v. *Ricard,* 355 Mass. 509 (1969). As we said in *Commonwealth* v. *Smith*: "The jury are ... the sole judges of the credibility and weight of all of the evidence on the issue of insanity. . . . The jury are not compelled to believe any such testimony or opinions, and the court cannot order them to do so by directing them to return verdicts of not guilty by reason of insanity. . . . The law should not, and does not, give the opinions of experts on either side of the issue the benefit of conclusiveness, even if there are no contrary opinions introduced at the trial." 357 Mass. at 178.

Second, we believe that the facts underlying the presumption are within the jury's common sense and knowledge and that it would be inappropriate and artificial to forbid jurors to rely, at least in part, on their common experience. See *Commonwealth* v. *Hosman,* 257 Mass. 379, 386 (1926); *United States* v. *Dube,* 520 F.2d 250, 254-255 (1st Cir. 1975) (Campbell, J., concurring). Cf. *Keys* v. *United States,* 346 F.2d 824, 826 (D.C. Cir.), cert. denied, 382 U.S. 869 (1965). "[I]n deciding the issue of insanity in a criminal case, the jury may infer that the defendant is sane from their common knowledge of the fact that a great majority of men are sane, and of the probability that any particular man is sane." *Commonwealth* v. *Smith, supra* at 179. See *Commonwealth* v. *Clark,* 292 Mass. 409, 415 (1935).

Finally, it is, and has been for over seventy years, incumbent on the Commonwealth to prove sanity beyond a reasonable doubt. This is not an insignificant burden, and is a safeguard against erroneous convictions. Thus, unlike almost half of the other jurisdictions, we have required

this standard of proof on the fact of sanity after the question has been raised. Even with the jury being allowed to consider the facts underlying the presumption, this standard must be met, or acquittal by reason of insanity is appropriate. We do not attempt to denigrate the proof necessary to meet this standard by noting that at least twenty-three jurisdictions place the burden of persuasion on the issue on the defendant, but we do think that the existence of that practice is relevant to our conclusion that our practice does not violate "generally accepted concepts of basic standards of justice." *Leland* v. *Oregon,* 343 U.S. 790, 799 (1952).[18]

Because of our conclusion that the presumption of sanity, as used in Massachusetts, does not violate due process, we find no error in the trial judge's refusal to direct a verdict of not guilty by reason of insanity.

5. *Disposition Under G. L. c. 278, § 33E.*

Although Kostka has not argued that we should set the verdict aside under G. L. c. 278, § 33E, because it was against the weight of the evidence, "we are required 'to consider the whole case broadly to determine whether there was any miscarriage of justice.' " *Commonwealth* v. *Mutina,* 366 Mass. 810, 812 (1975), quoting from *Commonwealth* v. *Ransom,* 358 Mass. 580, 583 (1970), and *Commonwealth* v. *Baker,* 346 Mass. 107, 109 (1963). After examination of the transcript and the record pursuant to our duties under § 33E, a majority of the court conclude that the verdict should not be set aside.

We believe that the instant case can be distinguished

---

[18] We also believe that our practice is consonant with Mr. Justice Frankfurter's dissent in *Leland,* in which he disagreed with the majority's conclusion that it was constitutionally permissible to place the burden of persuasion on the defendant. Mr. Justice Frankfurter stated: "That a man's act is not his, because he is devoid of that mental state which begets culpability, is so exceptional a situation that the law has a right to devise an exceptional procedure regarding it. Accordingly, States may provide ... that he on whose behalf the claim of insanity is made should have the burden of showing enough to overcome the assumption and presumption that normally a man knows what he is about and is therefore responsible for what he does." 343 U.S. at 804.

readily from the cases in which we have determined that the defendant's evidence of insanity was so compelling that reversal under § 33E was appropriate. In *Commonwealth* v. *Mutina, supra,* the defendant approached the murder victim as she returned home from a date one evening, stared at her and her companion for about a minute, and then fired two shots, one of which killed her. In *Mutina,* like the case of *Commonwealth* v. *Cox,* 327 Mass. 609 (1951), there was neither an intelligent plan nor a rational motive for the murder. In *Cox,* the defendant attempted to kill his wife by bludgeoning her with a hammer while she was playing the piano; not being immediately successful, he then lacerated her body with an ice pick and attempted to strangle her with a wire.

The facts of the instant case, on the other hand, warrant an inference by the jury that Kostka engaged in a carefully considered, intelligent plan to commit the crimes with which he is charged. It could be found that his motive was profit. As we have noted, the testimony of Mrs. Silverman permitted the conclusion that Kostka planned to rob the store at a time when only he and a salesperson would be present. Further, his threats to the girls in the store were clearly for the purpose of assuring his escape. The jury could properly consider these examples of restraint and caution as relevant to the dual tests (*Commonwealth* v. *McHoul,* 352 Mass. 544, 546 [1967]) of sanity, viz.: capacity to appreciate the wrongfulness of his conduct, and to conform his conduct to the requirements of the law. That the circumstances of the crime may be relied on to help establish sanity at the time the crime was committed is a principle that was firmly established in *Commonwealth* v. *Smith,* 357 Mass. 168, 178-180 (1970), and one that is widely accepted. See W.R. LaFave & A.W. Scott, Jr., Criminal Law § 40, at 315 (1972); H. Weihofen, Mental Disorder as a Criminal Defense 312-315 (1954); Annot., 17 A.L.R.3d 146, 179-181 (1968 & Supp. 1975), and cases cited.

Furthermore, although there was no expert testimony that Kostka was sane at the time the crimes were com-

mitted, we think it particularly significant that Dr. Christy, who had known Kostka for a period of years and was quite familiar with his medical history, did not have an opinion whether Kostka was insane at the time the crimes were committed. Although Dr. Mezer testified that Kostka was insane at that time, we note that the jury, because of the brevity of the relationship between Kostka and Dr. Mezer, would have been justified in according little weight to Dr. Mezer's conclusion.

Accordingly, after reviewing the entire evidence under § 33E, we conclude that justice does not require the ordering of a new trial, and does not require us otherwise to disturb the verdict of the jury.

*Judgments affirmed.*


HENNESSEY, C.J. (dissenting in part, with whom Kaplan, J., joins). I have written the main opinion for the court, and included in the final part of that opinion is a summary of the majority's reasoning in declining to act under § 33E. Of course I concur that there is no legal error in these proceedings. Nevertheless, I disagree with the court's decision not to exercise its discretion under § 33E and my conclusion on this issue is so firm as to warrant this separate opinion.

It is my view that, because of the extensive evidence of long-standing mental illness, including the uncontradicted expert testimony that Kostka was insane at the time he committed the crimes for which he was convicted, "justice in [this] particular case" (*Commonwealth* v. *Geraway*, 364 Mass. 168, 184 [1973]), would best be served by reversal of Kostka's conviction under G. L. c. 278, § 33E. This court has recently stated the basis for and the limitations on such a reversal in *Commonwealth* v. *Mutina*, 366 Mass. 810, 812, 816 (1975), and I need not repeat here what was said in *Mutina*. However, I do note that "[t]here was no medical testimony that [Kostka] was responsible. The fact that most men are sane, and a rational probability that

Commonwealth *v.* Kostka.

the defendant, too, may have been sane on [the date of the crimes] . . . seem . . . inadequate reasons upon which to disregard [the uncontradicted] medical opinion that he was not." *Commonwealth* v. *Cox,* 327 Mass. 609, 615 (1951). In this case, "[t]he fact that the [Commonwealth] chose to rely on the presumption rather than . . . [introduce] contradictory proof is inexplicable." *People* v. *Silver,* 33 N.Y.2d 475, 483 (1974). It is fair to infer either that the Commonwealth was unsuccessful in a search for a medical expert who would support the Commonwealth's position, or else the Commonwealth made no attempt to obtain such expert assistance. Although the presumption plays a role in a case such as this, I suggest that the Commonwealth runs the very real risk of reversal and the granting of a new trial if it chooses to rely on the presumption and the circumstantial evidence of sanity such as that adduced at this trial, rather than to introduce medical evidence of sanity.[1] Cf. *Commonwealth* v. *Mutina,* 366 Mass. 810 (1975); *Commonwealth* v. *Cox, supra.*

Because I suspect that the verdict "was not due to a careful consideration of the evidence, but [rather] that it [may have been] the product of bias, misapprehension or prejudice," *Scannell* v. *Boston Elevated Ry.,* 208 Mass. 513, 514 (1911), quoted in *Commonwealth* v. *Mutina, supra* at 816, I think that justice would best be served by a retrial at which Kostka would be entitled, on his motion, to the *Mutina* instructions on the consequences of a verdict of not guilty by reason of insanity.

---

[1] The Commonwealth need not be surprised by reliance on the defense of insanity, as we have ruled that the Commonwealth, pursuant to an appropriate motion, is entitled to notice of the defense. *Gilday* v. *Commonwealth,* 360 Mass. 170 (1971).